# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEWIS C. PELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12251-VCL |
| | ) | |
| ROBERT C. KILL, KENNETH H. PAULUS, KEVIN H. ROCHE, and JAMES P. STAUNER, | ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COGENTIX MEDICAL, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## OPINION

Date Submitted: May 16, 2016
Date Decided: May 19, 2016

Kelly A. Terribile, Gregory E. Stuhlman, Brittany M. Giusini, GREENBERG TRAURIG LLP, Wilmington, Delaware; Harold S. Shaftel, Benjamin K. Shiffman, GREENBERG TRAURIG LLP, New York, New York; *Counsel for Plaintiff.*

Sharon Oras Morgan, Carl D. Neff, Wali W. Rushdan, II, FOX ROTHSCHILD LLP, Wilmington, Delaware; Bret A. Puls, Carrie Baker Anderson, Laura E. Stecker, FOX ROTHSCHILD LLP, Minneapolis, Minnesota; *Counsel for Defendants.*

**LASTER, Vice Chancellor.**

Nominal defendant Cogentix Medical, Inc. (the "Company") has scheduled its annual meeting for May 20, 2016 (the "Annual Meeting"). Before the actions challenged in this case, its board of directors (the "Board") had eight seats staggered into three classes. Three were designated for Class I directors, three for Class II directors, and two for Class III directors. The Class I directors will stand for election at the Annual Meeting.

Before the events giving rise to this litigation, the eight members of the Board were aligned to varying degrees with either plaintiff Lewis C. Pell or defendant Robert C. Kill. Pell is a Class I director and the Company's largest stockholder. He was a co-founder and Chairman of the Board of Vision-Sciences, Inc. ("VSI"), one of two constituent corporations that merged to form Cogentix. Two other members of the Board were former directors of VSI.

Kill is a Class III director and the Company's incumbent CEO, President, and Chairman of the Board. He was CEO, President, and Chairman of Uroplasty, Inc., the second of the two constituent corporations that merged to form Cogentix. Four other members of the Board were former directors of Uroplasty.

On February 16, 2016, Pell filed an amendment to his Schedule 13D in which he publicly disclosed his intention to seek changes in the composition of the Board and the management team. The other directors understood that if Pell did not get his way, he intended to wage a proxy contest to elect himself and two allies as Class I directors. Over the next six weeks, it became clear that Pell wanted Kill terminated and Kill's closest allies, defendants Kenneth H. Paulus and Kevin H. Roche, to leave the Board.

1

The directors other than Pell and Kill attempted to find a negotiated solution, but Kill, Paulus, and Roche needed a Plan B. One of the Class I seats was held by a legacy-Uroplasty director, so if the negotiations failed, Pell's proxy contest could change the balance in the boardroom from a five-to-three majority to a four-to-four deadlock. Matters became more serious when a legacy-Uroplasty director in Class II resigned. At that point, if Pell succeeded in electing three Class I directors, the balance could flip to a four-to-three majority in Pell's favor.

As their Plan B, Kill, Paulus, and Roche developed a strategy to shrink the size of the Board from eight seats to five and reduce the number of Class I seats to one (the "Board Reduction Plan"). During a meeting of the Board held on March 29, 2016, the directors voted along party lines to approve the Board Reduction Plan. A reduction from eight seats to seven took place immediately, eliminating the vacancy created by the resignation of the Class II director. The reduction from seven seats to five will become effective at the Annual Meeting. Kill, Roche, and Paulus voted in favor. So did the fourth legacy-Uroplasty director, defendant James P. Stauner, who had decided not to stand for re-election. Pell and the two legacy-VSI directors voted against.

Through the Board Reduction Plan, Kill, Roche, Paulus, and Stauner (the "Defendant Directors") sought to preserve the legacy-Uroplasty directors' control over the Board and neutralize the threat of Pell's proxy contest. Before the Board Reduction Plan, the Company's stockholders had the opportunity to elect three nominees to the Class I seats, potentially establishing a new Board majority. By reducing the number of

2

Class I seats, the Defendant Directors ensured that no matter how the stockholders voted, they would retain a three-to-two majority.

Although the point is contested, I assume for purposes of analysis that the Defendant Directors sought to preserve their control not to extract personal benefits, but rather for the selfless purpose of overseeing a thorough and deliberative process after the Annual Meeting to re-constitute the Board with independent directors that they would identify, vet, and select. The problem is that when facing an electoral contest, incumbent directors are not entitled to determine the outcome for the stockholders. Stockholders elect directors, not the other way around. Even assuming that the Defendant Directors acted for an unselfish purpose, they still acted inequitably. A preliminary injunction shall issue enjoining the Company from implementing the portion of the Board Reduction Plan that otherwise would become effective at the Annual Meeting.

## I.    FACTUAL BACKGROUND

The facts are drawn from the record developed in connection with the application for a preliminary injunction. The parties have submitted numerous documentary exhibits and deposition testimony from five fact witnesses.

After the depositions were completed, both sides submitted affidavits from witnesses who had been deposed. The affiants' counsel could have elicited the averments in the affidavits when the witnesses' depositions were taking place, as they did on other matters. Had they done so, opposing counsel could have tested the assertions through

3

cross-examination. Because the lawyers eschewed that course, this decision largely discounts the affidavits.[1] It relies most heavily on the contemporaneous documents.

What follows are the facts as they are likely to be found after trial, based on the current record. This is a probabilistic exercise. To make the implicit explicit, the eventual findings of fact after trial could be different.

## B. The Company And Its Governance Structure

Cogentix is a Delaware corporation headquartered in Minnetonka, Minnesota. The Company designs, develops, manufactures, and markets medical device products for specialty medical markets, such as urology, gynecology, and bariatric medicine. Its common stock trades on NASDAQ under the symbol "CGNT."

Cogentix was formed through a stock-for-stock merger between two NASDAQ-listed companies: VSI and Uroplasty. The transaction closed on March 31, 2015 (the "Merger"). Technically, VSI acquired Uroplasty through a reverse-triangular merger. After the transaction closed, VSI changed its name to Cogentix.

In corporate governance terms, Uroplasty was the acquirer. Its former stockholders emerged owning approximately 62.5% of Cogentix, and its management team continued at the helm of the combined company. Kill had been Uroplasty's President, CEO, and

---

[1] *In re Del Monte Foods Co. S'holders Litig.,* 25 A.3d 813, 819 (Del. Ch. 2011); *see In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *19 (Del. Ch. May 22, 2000) (describing witness affidavits and explaining that the Court of Chancery will "ordinarily attach little if any weight to such inherently self-serving and non-adversarial proffers"); *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) ("To the extent the affidavits contradict the depositions, this Court will exclude the offending affidavit testimony.").

Chairman of the Board before the Merger. He assumed the same roles at Cogentix. Non-party Brett Reynolds had been Uroplasty's Chief Financial Officer. He took on that role for Cogentix.

More importantly for present purposes, legacy-Uroplasty directors commanded a majority of the Company's eight board seats. Five seats were held by former directors of Uroplasty, comprising the Defendant Directors and non-party Sven A. Wehrwein. Three seats were held by former directors of VSI, comprising Pell and non-parties Cheryl Pegus and Howard I. Zauberman.

For Pell and Zauberman, the Merger involved stepping back from more active roles at VSI. Pell was VSI's co-founder and its Chairman. Pell gave up the Chairman title to Kill and continued only as a director, although he appears to have been kept on the payroll as an employee, been given an office in the Company's headquarters, and been provided with an assistant and a driver. He also continued to have significant influence through his ownership of 7.1% of Cogentix's outstanding shares, which made him its second largest stockholder, and his status as the Company's largest creditor, having loaned VSI a total of $28.5 million. Zauberman had been the President and CEO of VSI and a director before the Merger. He continued only as a director.

Before the Merger, Section 1 of Article Twelfth of VSI's certificate of incorporation (the "Charter") empowered its board of directors to determine by resolution the total number of directors comprising the full board. The provision stated:

> The number of directors of the Corporation shall not be less than three. The exact number of directors within the limitations specified in the preceding

5

sentence shall be fixed from time to time pursuant to a resolution adopted by the Board of Directors.

Roche Aff. Ex. A at 12. The provision remained in effect after the Merger.

Before the Merger, Section 2 of Article Twelfth of VSI's Charter divided the Board into three classes. It stated:

> The Board of Directors shall be and is divided into three classes: Class I, Class II and Class III. No one class shall have more than one director more than any other class. If a fraction is contained in the quotient arrived at by dividing the designated number of directors by three, then, if such fraction is one-third, the extra director shall be a member of Class I, and if such fraction is two-thirds, one of the extra directors shall be a member of Class I and one of the extra directors shall be a member of Class II, unless otherwise provided from time to time by resolution adopted by the Board of Directors.

*Id.* This provision also remained in effect after the Merger.[2]

Before the Merger, the Uroplasty board had five members, and the VSI board had six. To accommodate the agreed-upon, post-Merger governance structure, the VSI board exercised its authority to increase the number of directors to eight. The post-Merger directors were allocated by class as follows, with the parenthetical letter denoting whether the individual was a legacy-Uroplasty or legacy-VSI director:

---

[2] The Company's by-laws (the "Bylaws") contained identical provisions. *See* Roche Aff. Ex. B §§ 2.2 & 2.3. The resulting duality is not relevant to this decision, so this decision does not distinguish between the provisions in the Charter and Bylaws.

6

| Class I (Term ends in 2016) | Class II (Term ends in 2017) | Class III (Term ends in 2018) |
|---|---|---|
| Pell (V) | Kill (U) | Paulus (U) |
| Stauner (U) | Pegus (V) | Roche (U) |
| Zauberman (V) | Wehrwein (U) | |

As required by NASDAQ Rule 5605(2), the post-Merger Board established three standing committees: the Audit Committee, the Compensation Committee, and the Governance and Nominating Committee (the "Nominating Committee"). The composition of the committees was as follows:

| Audit Committee | Compensation Committee | Nominating Committee |
|---|---|---|
| Wehrwein (Chair) (U) | Paulus (Chair) (U) | Roche (Chair) (U) |
| Stauner (U) | Pegus (V) | Paulus (U) |
| Roche (U) | Wehrwein (U) | Pegus (V) |

Legacy-Uroplasty directors thus chaired all three committees and constituted at least a majority of each committee's members.

## C.    Disputes Arise.

Disputes immediately arose between the leaders of the two predecessor companies. On the day after the Merger closed, Kill visited Pell at the former VSI headquarters in Orangeburg, New York. Kill and Pell dispute what was said, but it is clear that the meeting did not go well. By the end of the week, Pell was threatening to have Kill fired as CEO. *See* Kill Dep. 11, 62-63; Roche Dep. 89-90; Stauner Dep. 58-60.

Kill reported these incidents to the Audit Committee. The Audit Committee reprimanded Pell, but did not take further disciplinary action. Kill viewed this response as inadequate. He hired counsel and sent a letter to the Audit Committee to express his

dissatisfaction with the process, investigation, and results. Over the ensuing months, tensions grew.

**D.      The February 16 Letter**

The boardroom temperature rose significantly on February 16, 2016, when Pell sent his fellow directors an open letter in which he expressed his desire to change the management team and signaled his willingness to run a proxy contest. Stulhman Aff. Ex. 5 (the "February 16 Letter"). Pell told the other directors that he was "deeply disappointed by . . . the unsatisfactory performance and empty vision of the Company's leadership at both the executive management and Board levels." *Id.* at 2. He also stated, "I cannot stand by while the current executive management and Board leadership jeopardize the Company's full potential." *Id.*

The bulk of Pell's letter took aim at the Company's performance under Kill. Pell noted that the Company's stock price was "down approximately 75% since the announcement of the [M]erger" and that the Company's total market capitalization was less than its outstanding indebtedness. *Id.* Pell objected to Kill simultaneously holding the positions of Chairman, President, and CEO, through which Pell believed Kill exercised "far too much control over the Company and the Board." *Id.* Pell also noted that

> Except for me, none of the other Board members actually have significant stockholdings in the Company and, as a result, their interests are not sufficiently aligned with shareholders. Instead, most of the other Board members are closely and personally aligned with Mr. Kill. Although the [B]oard obviously should act as an independent monitor and check on Mr. Kill's authority and decision-making, [there are] examples of [its] failures to do so.

*Id.* The letter cited Kill's compensation package, which it described as "grossly out of line with what is warranted." *Id.* The letter noted that "[d]espite the fact that shareholders overwhelmingly recommended against that level of pay, the Board majority still opted to bestow it on Mr. Kill to whom they appear beholden." *Id.* The letter also cited the recent departure of "the Company's well-regarded CFO," which "left us in a position with no choice but to expand [Kill's] power beyond his positions as Chair, President and CEO to include the Principal Accounting Officer function as well." *Id.*

> The February 16 Letter also criticized the Company's lack of strategic vision:

> Not only have Mr. Kill and his Board allies presided over the loss of enormous shareholder value, but they have no sound strategy in place to put the Company on the path to achieve success. . . . I am suspicious that management and its Board allies may be more interested in finding means to generate short-term cash in order to pay for Mr. Kill's level of salary and to cover the Company's financial failures elsewhere. The answer, however, is not about short-sighted asset sales, but about building relationships and [sic] with the medical community end users of our current and future products—something which I know first-hand is a necessary ingredient for success in our business, but which our CEO does not do nor evidently understand.

*Id.* at 2-3.

Finally, Pell reiterated his intent to take action: "Given these failures on the part of the executive and Board leadership, I cannot silently watch missed opportunities for what can and should be a truly winning venture." *Id.* at 3. He stated that he was "mak[ing] known my goal and intentions to explore how best to make fundamental changes to the leadership of the Company, both at the executive and Board levels." *Id.*

Although Pell previously had made similar threats internally, this time he simultaneously filed his letter publicly as an amendment to his Schedule 13D. He did so,

9

he explained, because he felt that "all shareholders should be aware of these serious issues regarding the Company." *Id.*

**E.     The February 18 Meeting**

On February 18, 2016, two days after Pell sent the February 16 Letter, the Board held a regularly scheduled meeting (the "February 18 Meeting"). Among other items, the Board selected the date for the Annual Meeting. The Board also received reports from management regarding various aspects of the Company's business.

After concluding their normal business, the directors other than Pell and Kill met in executive session. Kill was the CEO and Pell was technically an employee, so this decision refers to the other directors as the "Outside Directors."

The Outside Directors began the executive session by calling in Pell and discussing the February 16 Letter. Pell explained that he wanted Kill terminated and would take action to achieve that goal if necessary. He indicated that he had the support of approximately 40% of the Company's stockholders and implied that he was prepared to change the composition of the Board. Everyone understood that Pell was threatening a proxy context.

Next, the Outside Directors excused Pell, called in Kill, and questioned him about Pell's allegations. Kill felt attacked and believed he was being forced to defend his job. *See* Kill Dep. 44-45.

Finally, the Outside Directors met without Pell and Kill. They designated Stauner and Paulus to attempt to negotiate a middle ground.

**F.      The Outside Directors Choose Sides.**

Although this fact is mildly contested, the record demonstrates that the February 16 Letter and the February 18 Meeting caused the Outside Directors to choose sides between Pell and Kill, which they did with varying degrees of conviction. Generally speaking, the legacy-Uroplasty directors aligned with Kill, and the legacy-VSI directors aligned with Pell. *See*, *e.g.*, Kill Dep. 20-22. In making this observation, I am not suggesting that the legacy directors were beholden to or controlled by either Pell or Kill. But human interactions are complex. The Outside Directors understandably had views about who was in the right, and their personal and professional relationships influenced their views.

Among the Outside Directors, Roche and Paulus emerged as Kill's closest allies. The contemporaneous documents illustrate this. For example, shortly after Pell sent the February 16 Letter, Wehrwein began talking about resigning from the Board. Roche sought to bolster Wehrwein's resolve by sending him an email in which he expressed his intent to stand by Kill and work through the issues that Pell was raising:

> We got into this situation in part because we thought the [M]erger was the solution to an intolerable position [at] [U]roplasty. We thought we needed to do something (and we may not have been wrong) and here we are. So I am actually perfectly happy to find some way to let the cornerstone of the intolerable situation stay as is and see if we can make it work as well as possible.
>
> *And just so I am clear with you, and I told [Paulus] the same thing, I will never abandon [Kill] in this situation, not because it is [Kill], but because I don't think his leaving would be in the best interests of the shareholders and I won't give in to Trump-like bullying, ever.*

Stuhlman Aff. Ex. 1 at 1 (emphasis added).

11

After the February 18 Meeting, Wehrwein reiterated that he was thinking about resigning. Roche again encouraged him not to resign, telling him that his presence was "invaluable." Stuhlman Aff. Ex. 9 at 1. Wehrwein mentioned in response that Pell "may have a point of view of my tenure" and "clearly doesn't like me." *Id.* Roche shot back:

> I would not spend one second worrying about what [Pell] does or doesn't think, just consider the speaker. And I am determined that [Pell] will never in any way control the board. That would be ruinous for the shareholders. I feel terrible about this, I feel like we appeased the villain [Pell] and punished [Kill].

*Id.* Kill, Roche, and Paulus exchanged numerous emails among themselves about how to respond to Pell and his proxy contest.

Wehrwein and Stauner were in a different position. They both supported Kill, but neither was committed to an all-out fight. Pell regarded Stauner and Wehrwein as more independent than Roche and Paulus, and he would later suggest that the Board form a special committee with Stauner and Wehrwein as its only members that would be tasked with trying to resolve the Company's management and board governance issues.

Similar gradations of allegiance operated on Pell's side. Zauberman had served as the CEO of VSI and was Pell's strongest ally. He vocally supported Pell. Pegus was aligned with Pell, but less openly and, seemingly, less closely.

## G.     Plan A and Plan B

After the February 18 Meeting, the factual story becomes complicated, with multiple threads proceeding in parallel. The central actor for the plaintiff was Pell, who continued to push openly and publicly for change at the Company. Zauberman actively supported and assisted Pell.

12

The central actors for the defendants were Kill, Roche, and Paulus. In addition to being Kill's strongest supporters, Roche and Paulus comprised a majority of the three-member Nominating Committee, and Roche served as its Chair. This put Roche and Paulus at the center of the Board-level governance struggle.

After the February 18 Meeting, Kill, Roche, and Paulus saw two possible paths. One path—Plan A—was for the Outside Directors to broker a negotiated resolution between Pell and Kill. Among themselves, Kill, Roche, and Paulus discussed possible terms, such as whether Kill would need to leave the Company and whether Pell would enter into a standstill agreement or stockholder voting agreement. As part of Plan A, Roche and Paulus led the Outside Directors in an effort to identify director nominees who might be acceptable to both Pell and Kill.[3] They hoped they could avoid a proxy contest if the Nominating Committee could find suitable nominees.

But if a negotiated resolution failed and suitable nominees could not be found in time, then Kill, Roche, and Paulus needed a Plan B. Under those circumstances, they believed Pell would launch a proxy contest to elect himself, Zauberman, and a third Class I director who would be allied with Pell. If Pell succeeded, it would change the reality in

_____

[3] *See, e.g.*, Stuhlman Aff. Ex. 2 (potential candidate); Stuhlman Aff. Ex. 3 (same); Stuhlman Aff. Ex. 9 (Roche asking Paulus for potential candidates); Stuhlman Aff. Ex. 12 (Kill reminding himself to identify "Independent Board members you would want us to consider if there is wholesale change. Guys like Bill Little who will support you."); Stuhlman Aff. Ex. 14 (Roche soliciting potential candidates from other directors); Stuhlman Aff. Ex. 16 (Roche reporting to Kill on conversation with candidate who was "only interested if I [Roche] were here, and even then, really not interested in taking on the Pell drama" and discussing possible candidates).

the boardroom from a five-to-three majority in favor of the legacy-Uroplasty directors to a four-four split. Kill, Roche, and Paulus regarded that outcome as unacceptable. They appear to have believed sincerely that Pell would use his increased Board-level influence to the detriment of the Company and its stockholders.

Kill, Roche, and Paulus needed a Plan B that would pre-empt the threat of Pell's proxy contest, and they hit upon the Board Reduction Plan as a solution. By email dated February 19, 2016, Kill suggested to Paulus what he thought the Board should do if Pell was "not in a compromising mood":

> [T]ell Pell and his assistant that they are terminated immediately as employees and no longer allowed to enter our office . . . , tell them that they can come back on Saturday to remove their personal belongings under supervision, go to a 6 person board by not re-nominating [Zauberman] and [Stauner], and tell Pell that he and Pegus will be in the upcoming class (which avoids any proxy fight)[.]

Stuhlman Aff. Ex. 6 at 1. Notably, Kill's email expressly linked the Board Reduction Plan to "avoid[ing] any proxy fight."

Later that day, Kill followed up with Paulus and reiterated his belief that the Board Reduction Plan would prove necessary:

> [Y]ou've convinced me that I underestimate Pell's crazy factor. He will not be reasonable this week. Once that happens, [Stauner] and [Wehrwein] need to have the common sense and integrity to do what's right after watching Pell in action at this week's meeting. What's right is the below plan [*i.e.,* the Board Reduction Plan Kill set out in the email quoted above]. Then, we temporarily upsize the Board by two after the Annual Meeting (I think I already have two independents that would take on the risk and be good for Darin [Hammers, formerly Uroplasty's Senior Vice President of Global Sales and Marketing and currently the Company's Chief Operating Officer]), and we can then execute the orderly transition for you, me and [Roche] without shareholder disruption. The bottom line is that Pell can't

14

be calling the shots…and he needs to know there are solutions not good for him if he isn't willing to play ball.

Stuhlman Aff. Ex. 7 at 1. In this email, Kill linked the Board Reduction Plan to (i) avoiding a proxy contest, termed euphemistically as "shareholder disruption," and (ii) enabling the Defendant Directors, not the stockholders, to determine who would serve as directors of the Company. The latter would be accomplished by upsizing the Board after the Annual Meeting and executing an "orderly transition" for Kill, Roche, and Paulus.

By email dated February 21, 2016, Paulus told Roche that he was largely committed to the Board Reduction Plan as Plan B:

> [B]een thinking a lot about this over the weekend. Feel like we appeased the villain [Pell] and punished the good guy [Kill]. Anyhow a couple of things that I think would be important in the discussion and understanding with [Pell]. . . . The third is that he will accept and agree to vote for, give his proxy for, the nominating committee's recommendations for the board. If [Pell] won't agree to the board thing then I think we need to persuade [Stauner] that the best option is to downsize the board—don't replace [Stauner] if he leaves and eliminate [Zauberman's] seat.

Stuhlman Aff. Ex. 10 at 1.

That same day, Paulus emailed Kill about the need "to figure out where we go from here once he [Pell] blows us off once again." Stulhman Aff. Ex. 11 at 1. Kill stressed the need to deploy the Board Reduction Plan as Plan B: "I agree that he [Pell] won't agree to anything . . . which is why [Stauner] and [Wehrwein] need to do what's right and downsize the Board. *It will be a solid 4-2 after that, and you [Paulus] and [Roche] will still control the Nominating Committee*." *Id.* (emphasis added). Kill thus tied the Board Reduction Plan explicitly to retaining a Board majority and the ability to use the Nominating Committee after the Annual Meeting to re-constitute the Board. A few

15

days later, Kill again linked the Board Reduction Plan to permitting the Defendant Directors to choose who would serve on the Board. *See* Stuhlman Aff. Ex. 15 at 1 (Kill writing, "I need to understand your [Roche's] strategy (downsize to 5 or 6 and add later OR add now to replace [Zauberman] and [Stauner])").

**H.      The Initial Negotiations Fail.**

Meanwhile, after the executive session on February 18, 2016, Stauner and Paulus tried to schedule a meeting with Pell to see if the three of them could "reach a mutually agreeable solution that would protect all shareholders and address some of the issues you [Pell] raised." Stauner Decl. Ex. 1 at 1. The meeting failed to occur when Pell insisted on having his attorney present. Stauner and Paulus told Pell that the Outside Directors had not contemplated a meeting that included counsel. By email dated February 24, 2016, Pell explained why he wanted his attorney present and reiterated his view that the legacy-Uroplasty directors were allied with Kill:

> I don't like the 3 of us [meeting]. Everytime [sic] you guys outnumber me I suffer. Paul [Rachlin, Pell's attorney,] or I will see you in court. I'm fed up with your bullshit. This board gave a 2 million dollar package to a CEO who was worth one 6th of that and the non binding [sic] vote by the stockholders said NO. Your board was not aligned with the stockholders. And that proves it. My 13D is about to blow up. See you in court and on the front page of [e]very [Minneapolis] newspaper.

*Id.*

**I.      The February 26 and March 1 Meetings**

By letter dated February 25, 2016, Pell demanded that the Board re-evaluate Kill's employment agreement and consider changes in the Board. He proposed that the Board

16

form a special committee, with Stauner and Wehrwein as its members, to independently evaluate issues relating to the management team, Board structure, and any transitions.

On February 26, 2016, in response to Pell's letter, the Outside Directors held a special meeting. They continued discussing the clash between Pell and Kill, and they considered Pell's demand for a special committee. They concluded that

> the appropriate governance process to address and consider Mr. Pell's requests was through the use of the Board's existing committee structure. Accordingly, the Board tasked the Company's Compensation Committee to review management's compensation and possible succession planning and tasked the [Nominating] Committee to evaluate the Board's composition and size.

Roche Decl. Ex. 2 at 1.

By letter dated February 28, 2016, Pell reiterated his demands. He also objected to the executive session conducted by the Outside Directors. He proposed again that the Board form a special committee. In response, the Outside Directors met again on March 1, 2016. They decided to stick with the approach they had agreed to on February 26. They anticipated that the committees would report to the full Board at a meeting "to be scheduled at the end of March." Stauner Aff. Ex. D at 1.

## J. Matters Come To A Head.

In early March 2016, the three-way negotiations among Pell, Kill, and the Outside Directors resumed in earnest. Pell made clear that in addition to terminating Kill, he also wanted Roche and Paulus off the Board.

Roche and Paulus were willing to consider resigning as part of a negotiated solution, but they did not want to hand the Company over to Pell. They wanted Pell to

drop his proxy contest, enter into a standstill agreement, and support three new independent directors who would replace Roche, Paulus, and Kill. They did not want to give Pell any voice in selecting the three new directors.

The need to make decisions for the Company's proxy statement ultimately forced the Defendant Directors to take action. With the Annual Meeting scheduled for May 20, 2016, the Board had to decide whom the Company would nominate. Kill and Roche sought to push off the Board meeting until "as late as possible." Stuhlman Aff. Ex. 18 at 1. Because of the timing requirements for filing the proxy statement, however, Kill noticed the meeting for March 21. The meeting was later pushed back to March 29.

Under its charter, the Nominating Committee was charged with recommending candidates to the Board. As part of its vetting process, the Nominating Committee evaluated for potential re-nomination any Class I directors whose terms were expiring as well as any new nominees that were suggested. By email dated February 28, 2016, Roche contacted his fellow directors about possible candidates. He explained that

> [i]n the event that at any time a director desires not to be nominated for re-election and because it is prudent for a company to always have a list of potential candidates for director vacancies, I would request that each of you forward to me a list of people you believe would be good possible directors for Cogentix, along with a brief background on the person. The [Nominating] Committee will then evaluate these potential candidates and maintain information on them in the event that vacancies arise.

Stuhlman Aff. Ex. 14 at 1. Roche's email notably did not mention any plan to reduce the size of the Board.

In another email dated February 28, 2016, Roche asked the three Class I directors if they wished to be re-nominated, and he solicited feedback from other members of the

18

Board about the Class I directors' performance. Stauner emailed Roche the next day, stating "I do not want to be re-nominated for re-election to the Board." Stuhlman Aff. Ex. 59 at 1. Pell and Zauberman responded that they wished to be re-nominated. Roche Aff. Ex. J at 1.

On March 16, 2016, Roche emailed Pegus and Paulus about a meeting of the Nominating Committee to be held on March 18. He identified the following agenda items:

1. Consideration of renomination of Lew Pell.

2. Consideration of renomination of Howard Zauberman.

3. Discussion regarding the seat being vacated by Jim Stauner.

4. Discussion re size of board.

5. Discussion re separating CEO and Chairperson roles.

Roche Aff. Ex. N at 1. Roche did not provide further detail regarding the item about "size of board."

In his March 16 email, Roche described the feedback he had received about Pell and Zauberman:

> In regard to Lew Pell, one person praised his performance and recommended renomination. Others commented on troublesome aspects of his performance, but generally supported renomination due to his equity and debt position in the company.

> In regard to Howard Zauberman, one person praised his performance and recommended renomination. The remainder noted issues with Mr. Zauberman's performance and recommended he not be renominated.

*Id.*

Evidencing his alignment with Kill and opposition to Pell, Paulus responded by inquiring about requiring directors to disclose any ties with Pell. He wrote:

> Given the proxy process we are currently managing, is there any utility in reviewing our conflict of interest policy for good governance and for individual directors? I also wonder if we should ask each board member to complete a disclosure of any business, financial, or investment activities with Lew Pell.

*Id.* Pegus wrote back, observing that the disclosure should not "be focused on relationships with [Pell]" but rather broadened to include any entanglements. Stuhlman Aff. Ex. 26 at 1. Paulus agreed and observed that "[w]e will have to walk a careful line as we manage the proxy fight with one shareholder while considering the interests of the others." *Id.* Paulus thus recognized in writing what everyone had known since February 16: Without a negotiated settlement, a proxy fight was coming.

On March 18, 2016, the Nominating Committee held a telephonic meeting. Roche presided as Chair, and Paulus and Pegus attended. The minutes recount that the members "voted two to one to recommend that the board nominate Mr. Pell to serve as the sole director of Class I of the Board of Directors." Roche Aff. Ex. Q at 1. The members also "voted two to one to recommend that the Board not nominate Mr. Zauberman to serve as a Class I director of the Board and allow his term to expire at the 2016 Annual Meeting of the Stockholders." *Id.* Pegus was the dissenting vote. Paulus Dep. 30.

The Nominating Committee members next turned to the issue of reducing the size of the Board. According to the minutes,

> Mr. Roche led a discussion with the Committee regarding the potential size of the Board, noting that the Committee elected not to nominate Mr. Zauberman and understood that James Stauner was contemplating whether

20

he would agree to stand for reelection and may resign effective as of the expiration of his term. The Committee reflected on prior discussions relative to reducing the Board size by two seats, and the challenge of recruiting new members in compliance with the Committee Charter and Policy prior to the [A]nnual [M]eeting. A discussion took place during which Mr. Roche responded to questions from Committee members and the Committee discussed the pros and cons of eliminating the two board seats form Class I of the Board of Directors, if Mr. Stauner confirmed that he would [not] stand for reelection and would resign his seat in connection with the [A]nnual [M]eeting of stockholders.

*Id.* at 2. The Nominating Committee members "voted two to one to recommend that . . . in conjunction with the Company's [A]nnual [M]eeting the Board be decreased to five (5) [sic] members by decreasing Class I of the Board to one member and that [the] Board nominate Mr. Pell as the singular Class I successor." *Id.* The reference to "five (5) members" was either a typographical error or an anachronism that crept in when the minutes were drafted later. At the time, reducing the Board by two seats would have resulted in six members. The Nominating Committee did not decide to reduce the Board to five seats until after Wehrwein's resignation, which occurred three days later.

Although the record is not clear on this point, it seems likely that Pegus contacted Zauberman and Pell and reported on what had occurred at the meeting. By email dated March 22, 2016, Zauberman wrote to Kill, asking "I hear rumors that you want me off the Board. Do I get to hear from you first or is [it] going to be a surprise?" Stuhlman Ex. 20 at 1. Kill responded:

You must not be familiar with how a public company board works. The Nominating Committee seeks input from all board members, and they then meet to determine their recommendation to the full board. If any decision were to be made, communication would come from those who made that decision.

*Id.*

Kill nevertheless asked Roche to talk with Zauberman. On the morning of March 23, 2016, Roche and Zauberman had a call. Afterwards, Zauberman sent an email to Pell in which he reported on the conversation:

> I spoke with Kevin Roche this morning . . . . He said that the [Nominating] Committee will be recommending the following:
>
> 1. Reduce the Board by 2 positions eliminating [Stauner] and me. He stated that they believe this would make it easier to control the Board and that they consider me biased towards [Pell].
>
> 2. Renominate [Pell] to the Board[.]
>
> 3. Leave [Kill] with both [the] CEO and Chairman role. Only separate CEO from Chairman roles should they negotiate a transition for and with [Kill], and then hire a new CEO.

Stuhlman Aff. Ex. 35 at 1 (formatting added). At least according to Zauberman, Roche linked the Board Reduction Plan to "control [of] the Board."[4]

## K.    Wehrwein Resigns.

While these events were transpiring, Wehrwein resigned from the Board. On March 21, 2016, he sent an email only to Kill, Stauner, and Roche in which he resigned,

---

[4] In the Complaint, Pell alleged that he did not learn of the Board Reduction Plan until the Board meeting on March 29, 2016, when the plan was proposed to the Board and approved. That was true, in the sense that it was the first time Pell received official notice. Discovery established that Pell received indications that the Defendant Directors were planning something along the lines of the Board Reduction Plan soon after the March 18 meeting of the Nominating Committee and again from Zauberman on March 22 and 23. The Defendant Directors claim that because Pell heard rumors earlier about what the Defendant Directors were planning, the Complaint was false and Pell's theory materially discredited. *See* Dkt. 48 at 4-5, 39-40. In my view, Pell's account was materially accurate, and the Defendant Directors protest too much on this point.

effective immediately. Wehrwein had served as the Chair of Audit Committee and was designated as that committee's financial expert.

Kill informed the other directors of Wehrwein's resignation on March 23, 2016. Kill wrote that "[i]n speaking with [Wehrwein], he said that he was 'tapping out' as he could no longer deal with the conflict within our Board." Kill Aff. Ex. J at 1.

Wehrwein's resignation prompted Roche to suggest reducing the size of the Board to five. In an email dated March 25, 2016, Roche shared his thoughts with Paulus and Pegus, the other members of the Nominating Committee:

> I would guess I speak for everyone when I say that I am extremely disappointed in [Wehrwein] leaving in this critical time, particularly because he is our audit committee chair and financial statement expert. I really don't understand it at all. As I try to process this in regard to our board decisions on Tuesday and after talking to the attorney, my thought is to simply now downsize the board by three seats. We can then take time to fully evaluate someone to replace [Wehrwein] as the financial statement and audit expert, evaluate the board candidate [Pell] suggested, and evaluate other potential candidates. There simply is not time now for us to do that evaluation properly.

Roche Aff. Ex. R at 1. Pegus responded that she agreed with that plan. *Id.*

Three days later, in anticipation of a meeting of the Board to be held the next day, Roche emailed Paulus and Pegus, noting that "[w]ith the pace of events we haven't had a chance to jointly discuss all the ramifications for governance, but I wanted to give both of you the gist of what I will say tomorrow." Roche Aff. Ex. S at 1. His email included the following draft report:

> [The] Nominating Committee was charged with examining board composition and other governance issues, in addition to its annual tasks in regard to the proxy and shareholder meeting, and with making recommendations on those issues and tasks.

23

This process was complicated by [Wehrwein's] resignation and [Stauner's] indication that he likely would not stand for re-election . . . .

[Wehrwein's] resignation leaves us without an audit committee financial expert, a serious concern that we need to address in 180 days under NASDAQ rules.

Our ultimate goal is to try to rebuild a board that has the skills to effectively oversee the company's business and management for the benefit of all shareholders and that maximizes a perception of independence in performing those tasks and avoids persons who are perceived as having too close a tie to management or current directors or specific shareholders. We also should evaluate separating the CEO and Chairperson roles in conjunction with the board rebuilding.

To do this effectively will take a careful, thoughtful process that cannot and should not be hurried. The [Nominating] Committee has begun setting out that process, which can include the use of an outside search firm to identify and evaluate candidates in accordance with the criteria and qualifications we set forth. Our initial focus should be to identify the replacement audit committee financial expert.

In light of all the considerations and circumstances in which we find ourselves, our recommendations, some of which are standard ones relating to the annual proxy process, include:

. . .

3. Renominat[ing] Lew Pell as a Class 1 director.

4. Reduc[ing] the board immediately to seven members by eliminating the seat that was held by [Wehrwein] and decreasing Class II to two members. Reduce the board size to five effective at the shareholder meeting by decreasing Class 1 to one member, who would be Lew Pell, [and] eliminating [Stauner's] and [Zauberman's] seats.

*Id.* To justify the Board Reduction Plan, Roche thus cited the desire to enable the incumbent directors, rather than the stockholders, to "rebuild [the] board." *Id.*

After reviewing Roche's email, Paulus endorsed the draft report:

24

> This looks good to me. I support this approach and the items recommended. That said, it is clear we have work to do to put the board back together again post downsizing.

Stuhlman Aff. Ex. 39 at 1. Paulus thus also linked the Board Reduction Plan to the incumbent directors' desire to "put the board back together" rather than having the stockholders decide.

Although the record again is not clear, it seems likely that Pegus reported to Zauberman and Pell about what Roche was proposing. On March 28, 2016, the next day, Pell sent another letter to the Board and filed it publicly as an exhibit to his Schedule 13D. Pell also provided the Company with formal notice, likewise dated March 28, that he intended to nominate himself, Zauberman, and non-party Dr. James D'Orta for election as Class I directors. The notice included eight stockholder proposals to be addressed at the Annual Meeting. Without commenting on the validity of any of the proposals, they were:

- "[A]mend Section 2.2 of the [Bylaws] and Article XII, Section 1 of the [Charter] to fix the size of the Board at eleven (11) members";

- "[R]epeal each provision of amendment to the [Bylaws] adopted by the Board subsequent to July 15, 2009, which is the date of the last publicly available [Bylaws], without the approval of the stockholders of the Company";

- "[R]epeal any action taken by the Board relating to the composition of the Board approved on or after the date of this Notice and prior to the 2016 Annual Meeting";

- "[R]emove any person or persons, other than the persons elected at the 2016 Annual Meeting, elected or appointed to the Board to fill any vacancy or newly created directorship on or after the date of this Notion and prior to the 2016 Annual Meeting";

- "[A]mend Section 2.8 of the [Bylaws] and Article XII, Section 7 of the Charter to allow for director removal by the stockholders without cause";

25

- "[A]mend Section 2.9 of the [Bylaws] and Article XII, Section 8 of the Charter to provide that any vacancies on the Board resulting from the removal of any director by the stockholders of the Company shall be filled exclusively by the stockholders of the Company";

- "[R]equire that the Board adopt a policy and amend the [Bylaws] as necessary, to require that the position of chairman of the Board (the 'Chair') be held by an individual who does not concurrently hold the position of Chief Executive Officer . . .";

- "[R]equire that the Board adopt a policy, and amend the [Bylaws] as necessary, to require that the positions of Principal Accounting Officer or Principal Financial Officer of the Company be held by an individual who does not concurrently hold the position of Chief Executive Officer . . . ."

Kill Aff. Ex. K at 2-3.

## L.    The March 29 Meeting

On March 29, 2016, the Board met at the Company's headquarters (the "March 29 Meeting"). Kill, Paulus, and Roche attended in person. The other directors attended by telephone.

Kill noted that the Company had received Pell's letter nominating three individuals as Class I directors and proposing items of business for the Annual Meeting. He also noted that "the primary purpose of the meeting was to discuss the reports and recommendations of the [Nominating Committee] and Compensation Committee . . . in response to Mr. Pell's previously expressed concerns regarding the Company's management and Board structure." Roche Aff. Ex. T at 1.

Roche gave the report of the Nominating Committee. He "reported that the committee was tasked . . . with evaluating the Board's current composition in light of Mr. Pell's demands with the ultimate goal of providing a Board that adequately represented all stockholders" and that the Committee also had conducted its "annual review of

26

incumbent candidates for re-nomination to the Board." *Id.* At that point, Stauner confirmed that he did not intend to stand for reelection and "would resign his seat in connection with the [A]nnual [M]eeting of stockholders and that his resignation would be effective that day." *Id.* After noting that Wehrwein had resigned, Roche reported that the Committee made recommendations that included the following:

> That the Board size (i) be immediately decreased to seven (7) members by eliminating the seat previously held by Sven Wehrwein and decreasing Class II of the Board to two members, and (ii) in conjunction with the election of the sole director at the Company's [A]nnual [M]eeting be decreased to five (5) members by decreasing Class I of the Board to one member; and

> That the Board nominate Mr. Pell as the singular Class I successor and to serve as the sole director of Class I of the Board of Directors for a three-year term ending at [the] 2019 Annual Meeting of Stockholders or until his successor is elected and qualified.

*Id.* at 2.

The Board considered resolutions consistent with the Nominating Committee's recommendations. They passed by a vote of four to three. Kill, Roche, Paulus, and Stauner voted in favor. Pell, Zauberman, and Pegus voted against.

## M.    The April 5 Meeting

After the March 29 Meeting, the Defendant Directors girded themselves for the proxy contest. On April 1, Kill wrote to Stauner and Paulus about scheduling a meeting of the Board "to set up an executive committee of the board which excludes Pell and Zauberman, as they are now adversarial to the Board and should not participate in discussions related to our strategies around the proxy and solicitation of proxies." Stuhlman Aff. Ex. 44 at 1.

27

On April 2, 2016, Kill gave formal notice of a meeting for April 5. He identified the purpose as "discuss[ing], among other things, our annual stockholders meeting." Stuhlman Aff. Ex. 49 at 1. When Zauberman asked for more details, Kill ignored him, telling Roche, "I am not replying to him [Zauberman]. Nothing requires us to do so." *Id.* During the meeting on April 5, the Defendant Directors voted to form the special committee.

**N.    The Proxy Fight And This Litigation**

On April 5, 2016, Cogentix filed its preliminary proxy statement in connection with the Annual Meeting. Two days later, Pell filed his preliminary proxy statement. Both sides have filed their definitive proxy statements and a series of updates.

Pell filed this action on April 25, 2016. He seeks "declaratory and injunctive relief to invalidate the [Defendant] Directors' unlawful actions, to vindicate his rights as a stockholder and board member, to protect the stockholder franchise, and to negate unlawful efforts by the [Defendant] Directors to maintain Board control and suppress opposition." Compl. ¶ 6. Following expedited discovery, a preliminary injunction hearing was held on May 16.

## II.    LEGAL ANALYSIS

Pell seeks a preliminary injunction barring the Company from implementing the Board Reduction Plan pending a trial on the merits. To obtain a preliminary injunction, Pell must demonstrate (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*,

506 A.2d 173, 179 (Del. 1986). All three elements are met, and a preliminary injunction will issue.

## A.     The Probability of Success on the Merits

The first element of the familiar injunction test requires that the plaintiff establish a reasonable probability of success on the merits. This standard "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998) (quotation marks omitted).

### 1.     Enhanced Scrutiny Applies

"When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."[5] "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care." *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 35 (Del. Ch. 2013). When litigation arises, directors are not

---

[5] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *see* William T. Allen, Jack B Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295-99 (2001) [hereinafter *Function Over Form*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451-52 (2002) [hereinafter *Realigning the Standard*]; *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1416-25 (2005) (distinguishing between the standards of fiduciary conduct and standards of review).

judged by the standard of conduct, but rather through the lens of a standard of review. *Id.* at 35-36; Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 437 (1993). "In each manifestation, the standard of review is more forgiving of directors and more onerous for stockholder plaintiffs than the standard of conduct."[6]

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). Particularly during the 1980s, standards of review seemed to proliferate. The landmark decisions in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985), and *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986), for example, were perceived initially to be separate doctrines, with the latter imposing affirmative conduct obligations on directors. Over the ensuing decades, Delaware decisions have made clear that *Revlon*

---

[6] *Chen*, 87 A.3d at 666. "The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule." *Id.* at 667. For cogent explanations, see *Function over Form*, *supra*, at 1296, and *Realigning the Standard*, *supra*, at 451-57 (same). *Accord* Eisenberg, *supra*, at 444, 461-67; Veasey & Di Guglielmo, *supra*, at 1421-28; Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553-58 (2012). Opinions articulating the policy rationales for applying standards of review that are more lenient than the underlying standards of conduct include *Brehm v. Eisner*, 746 A.2d 244, 255-56 (Del. 2000), and *Gagliardi v. TriFoods International, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (Allen, C.).

does not impose conduct obligations but rather operates as a form of reasonableness review, *i.e.*, a manifestation of enhanced scrutiny.[7]

It likewise seemed that Chancellor Allen's famous decision in *Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988), gave rise to a separate standard of review. Since then, the Delaware Supreme Court has made clear that *Blasius* is a form of enhanced scrutiny in which the compelling justification concept from that decision is applied "*within* the . . . enhanced standard of judicial review."[8] Writing while serving on

---

[7] *See, e.g.*, *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994) ("[A] court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination." (emphasis removed)); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 595-96 (Del. Ch. 2010) (Strine, V.C.) ("[A]lthough the level of judicial scrutiny under *Revlon* is more exacting than the deferential rationality standard applicable to run-of-the-mill decisions governed by the business judgment rule, at bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 192 (Del. Ch. 2007) (Strine, V.C.) ("What is important and different about the *Revlon* standard is the intensity of judicial review that is applied to the directors' conduct. Unlike the bare rationality standard applicable to garden-variety decisions subject to the business judgment rule, the *Revlon* standard contemplates a judicial examination of the reasonableness of the board's decision-making process."); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005) (Strine, V.C.) ("[In *Revlon*,] the Supreme Court held that courts would subject directors subject to *Revlon* . . . to a heightened standard of reasonableness review, rather than the laxer standard of rationality review applicable under the business judgment rule."). *See generally* J. Travis Laster, Revlon *is a Standard of Review: Why It's True and What It Means*, 19 Fordham J. Corp. & Fin. L. 5 (2013) (collecting authorities).

[8] *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1129-31 (Del. 2003); *accord Stroud v. Grace*, 606 A.2d 75, 92 n.3 (Del. 1992) ("In certain circumstances, a court must recognize the special import of protecting the shareholders' franchise within

31

this court, Chief Justice Strine likewise explained the role of *Blasius* within the larger context of the intermediate standard of enhanced scrutiny.[9]

The question of what causes enhanced scrutiny to serve as the operative standard of review is a different inquiry than what it takes to satisfy or fall short of the parameters of the test. Stated generally, enhanced scrutiny applies "where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors."[10] "Inherent in these situations are subtle structural and situational

---

*Unocal*'s requirement that any defensive measure be proportionate and reasonable in relation to the threat posed." (quotation marks omitted)).

[9] *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 797, 805-813 (Del. Ch. 2007) (Strine, V.C.); *accord Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 258-259 (Del. Ch. 2013) (Strine, C.); *see Chesapeake Corp. v. Shore*, 771 A.2d 293, 323 (Del. Ch. 2000) (Strine, V.C.) (recommending unification of *Blasius* and *Unocal* by having the Delaware courts "infuse our *Unocal* analyses with the spirit animating *Blasius* and not hesitate to use our remedial powers where an inequitable distortion of corporate democracy has occurred."); *Function Over Form*, *supra*, at 1311-1316 (same). *See generally* Leo E. Strine, Jr., *The Story of* Blasius Industries v. Atlas Corp., *in Corporate Law Stories* 243 (J. Mark Ramseyer ed., 2009) [hereinafter *Story of* Blasius].

[10] *Trados II*, 73 A.3d at 43; *accord Reis*, 28 A.3d at 457-59; *see QVC*, 637 A.2d at 42 ("[T]here are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable."); *Dollar Thrifty*, 14 A.3d at 598 ("In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board to block a bid or to steer a deal to one bidder rather than another."); *see also In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 731 (Del. Ch. 1999) (describing *Revlon* as "an important comment on the need for heightened judicial scrutiny when reviewing situations that present unique agency cost problems"), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE). *See generally* Julian Velasco, *Structural Bias and the Need for Substantive Review*, 82 Wash. U. L.Q. 821, 870-83 (2004).

conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference."[11]

Normally directors who face a proxy context confront a structural and situational conflict because their own seats are at risk. "A candidate for office, whether as an elected official or as a director of a corporation, is likely to prefer to be elected rather than defeated. He therefore has a personal interest in the outcome of the election even if the interest is not financial and he seeks to serve from the best of motives." *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1206 (Del. Ch. 1987). Consequently, "[w]hen the election machinery appears, at least facially, to have been manipulated, those in charge of the election have the burden of persuasion to justify their actions." *Id.* at 1207.

Enhanced scrutiny, however, is not limited to electoral contests where the entire board might be replaced. "Enhanced scrutiny also applies in other situations where the

---

[11] *In re Rural Metro Corp. S'holder Litig.*, 88 A.3d 54, 81 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *see Dollar Thrifty*, 14 A.3d at 597 ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decisionmaking and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."); *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *11 (Del. Ch. Dec. 10, 1998) (locating enhanced scrutiny under *Unocal* and *Revlon* between the business judgment rule and the entire fairness test); *see also* Stephen M. Bainbridge, Unocal *at 20: Director Primacy in Corporate Takeovers*, 31 Del. J. Corp. L. 769, 795–96 (2006) (explaining Delaware Supreme Court's creation of an intermediate standard of review between the entire fairness and business judgment rule standards); Ronald J. Gilson, Unocal *Fifteen Years Later (And What We Can Do About It)*, 26 Del. J. Corp.. L. 491, 496 (2001) ("In *Unocal*, the Delaware Supreme Court chose the middle ground that had been championed by no one. The court unveiled an intermediate standard of review . . . .").

law provides stockholders with a right to vote and the directors take action that intrudes on the space allotted for stockholder decision-making."[12]

> The most fundamental principles of corporate governance are a function of the allocation of power within a corporation between its stockholders and its board of directors. The stockholders' power is the right to vote on specific matters, in particular, in an election of directors. The power of managing the corporate enterprise is vested in the shareholders' duly elected representatives. . . .
>
> Maintaining a proper balance in the allocation of power between the stockholders' right to elect directors and the board of directors' right to manage the corporation is dependent upon the stockholders' unimpeded right to vote effectively in an election of directors.

*Liquid Audio*, 813 A.2d at 1126-27 (footnotes omitted). The Delaware Supreme Court and this court "have remained assiduous in carefully reviewing any board actions designed to interfere with or impede the effective exercise of corporate democracy by shareholders, especially in an election of directors." *Id.* at 1127.

For enhanced scrutiny to apply, the board's actions "need not actually prevent the shareholders from attaining any success in seating one or more nominees in a contested election for directors and the election contest need not involve a challenge for outright control of the board of directors." *Id.* at 1132. When there is director conduct "affecting either an election of directors or a vote touching on matters of corporate control," the

---

[12] *Reis*, 28 A.3d at 457; *see State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *10–11 (Del. Ch. Dec. 4, 2000) (applying enhanced scrutiny to meeting adjournment that kept polls open for vote on increasing shares allocated to stock option plan).

34

board must justify its action under the enhanced scrutiny test.[13] In this case, both reasons for applying enhanced scrutiny exist.

First, the Board Reduction Plan "affect[ed] . . . an election of directors." *Mercier*, 929 A.2d at 811. Before the Board Reduction Plan, stockholders would vote on three seats. After the Board Reduction Plan, stockholders will only vote on one seat. The Board Reduction Plan therefore has a clear and obvious effect on the ability of the stockholders "to vote either contrary to the will of the incumbent board members generally or to replace the incumbent board members in a contested election." *Liquid Audio*, 813 A.2d at 1129.

Second, the Board Reduction Plan "touch[ed] on" matters of corporate control. Before the Board Reduction Plan, control over Cogentix was in play because the stockholders could elect a slate of three directors who, together with the divided incumbents, could form a new majority. After the Board Reduction Plan, control over Cogentix was no longer in play. Stockholders could only re-elect one incumbent without affecting the composition of the Board or the direction of the Company.

Both types of conduct are sufficiently suspect to warrant review under the enhanced scrutiny test. "Of course, the mere fact that the court uses a heightened

---

[13] *Mercier*, 929 A.2d at 811; *see Stroud*, A.2d at 92 n.3 (holding that enhanced scrutiny applies whenever a board takes unilateral action "touch[ing] upon issues of control" (quotation marks omitted); *Gilbert v. El Paso Corp.*, 575 A.2d 1131, 1144 (Del. 1990) (holding that a court must apply enhanced scrutiny whenever the board acts "in response to some threat to corporate policy and effectiveness which touches upon issues of control").

35

reasonableness standard does not mean that the directors will fail to satisfy it." *Sandridge*, 68 A.3d at 259. Put differently, determining whether enhanced scrutiny applies is different than determining whether enhanced scrutiny is met.

### 2. The Parameters Of Enhanced Scrutiny In The Voting Context

When tailored for reviewing director action that affects stockholder voting, enhanced scrutiny requires that the defendant fiduciaries bear the burden of proving (i) that "their motivations were proper and not selfish," (ii) that they "did not preclude stockholders from exercising their right to vote or coerce them into voting a particular way," and (iii) that the directors' actions "were reasonable in relation to their legitimate objective." *Mercier*, 929 A.2d at 810-11. "If for some reason, the fit between means and ends is not reasonable, the directors would also come up short." *Id.* at 811.

The Delaware Supreme Court has held that when the vote involves an election of directors or touches on matters of corporate control, the directors' justification must not only be "reasonable" but also "compelling." *Liquid Audio*, 813 A.2d at 1129-30. In this context, the shift from "reasonable" to "compelling" requires that the directors establish a closer fit between means and ends. *Mercier*, 929 A.2d at 819. Although linguistically reminiscent of the type of review given to suspect classifications under the federal constitution, the use of the word "compelling" is not intended to signal that type of strict scrutiny. *Id.* Instead, it is a reminder for courts to approach directorial interventions that

affect the stockholder franchise with a "gimlet eye."[14] It is also a reminder that in the context of voting rights, there is one justification that the directors cannot use to justify their actions: they cannot argue that without their intervention, the stockholders would vote erroneously out of ignorance or mistaken belief about what course of action is in their own interests.[15]

I have assumed that the Defendant Directors motives were proper and not selfish. The enhanced scrutiny analysis therefore turns on the second and third aspects of the test: whether the directors precluded stockholders from exercising their right to vote or

---

[14] *Chesapeake Corp. v. Shore*, 771 A.2d 293, 323 (Del. Ch. 2000) (Strine, V.C.) ("If *Unocal* is applied by the court with a gimlet eye out for inequitably motivated electoral manipulations or for subjectively well-intentioned board action that has preclusive or coercive effects, the need for an additional standard of review is substantially lessened. Stated differently, it may be optimal simply for Delaware courts to infuse our *Unocal* analyses with the spirit animating *Blasius* and not hesitate to use our remedial powers where an inequitable distortion of corporate democracy has occurred."); *Function Over Form*, *supra*, at 1316 ("The post-*Blasius* experience has shown that the *Unocal/Unitrin* analytical framework is fully adequate to capture the voting franchise concerns that animated *Blasius*, so long as the court applies *Unocal* with a gimlet eye out for inequitably motivated electoral manipulations or for subjectively well-intentioned board action that has preclusive or coercive effects." (quotation marks omitted)).

[15] *Id.*; *see Story of* Blasius, *supra*, at 245 (explaining that directors have "no authority to prevent stockholders from seating a new board on the paternalistic grounds that the stockholders did not realize that what was best for them was that the incumbent board remain in power"); *id.* at 269 ("While in office, directors [are] free to take a myriad of business decisions that stockholders might not favor. But what directors [are] not free to do [is] to decide that stockholders [have] to be protected from themselves, by impairing their ability to choose a new set of directors to manage the company."); *id.* at 290 ("[W]hat was core to *Blasius* was that the judiciary not accept the doctrine of substantive coercion as a justification for director conduct affecting the election process.").

37

coerced them into voting in a particular way, and whether the directors' actions bore a sufficiently close relationship to a legitimate objective. *Mercier*, 929 A.2d at 810.

### a. Preclusion

It is reasonably probable that the Defendant Directors will not be able to establish at trial that the Board Reduction Plan is not preclusive. "For a measure to be preclusive, it must render a successful proxy contest realistically unattainable given the specific factual context." *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 603 (Del. 2010).

The Board Reduction Plan made success in a proxy contest realistically unattainable in two ways. First, it eliminated the possibility of success for two seats. Before the Board Reduction Plan, stockholders had the opportunity to elect three directors. After the Board Reduction Plan, they could elect only one director. By eliminating two seats, the Board made it impossible for stockholders to elect directors to those positions. By doing so, the Board imposed its favored outcome on the stockholders: no new directors.

The Board Reduction Plan also made a successful proxy contest realistically unattainable because it prevented the stockholders from establishing a new majority. Before the Board Reduction Plan, stockholders could establish a new board majority by electing three Class I directors. After the Board Reduction Plan, that was no longer possible. Once again, the Board imposed its favored outcome on the stockholders: no change in Board-level control.

The factual record supports these findings and demonstrates that the Defendant Directors approved the Board Reduction Plan to avoid a proxy fight that they feared Pell

38

would win. Before Wehrwein resigned, they believed that Pell could change the board governance dynamic from a five-to-three majority that favored the legacy-Uroplasty directors to a four-four split. In his email to Paulus dated February 19, 2016, Kill proposed the Board Reduction Plan, noting that it "avoids any proxy fight." Stuhlman Aff. Ex. 6 at 1. Later that day, Kill reiterated his support for the Board Reduction Plan, stressing that it would prevent Pell from having any chance at "calling the shots":

> What's right is [the Board Reduction Plan]. Then, we temporarily upsize the Board by two after the Annual Meeting . . . , and we can then execute the orderly transition for you [Paulus], me [Kill] and [Roche] without shareholder disruption. The bottom line is that Pell can't be calling the shots…and he needs to know there are solutions not good for him if he isn't willing to play ball.

Stuhlman Aff. Ex. 7 at 1. Kill euphemistically referred to the ability of stockholders to elect three directors as "shareholder disruption." *Id.* Paulus agreed, writing that "[i]f [Pell] won't agree to [support the Nominating Committee's candidates] then I think we need to persuade [Stauner] that the best option is to downsize the board—don't replace [Stauner] if he leaves and eliminate [Zauberman's] seat." Stuhlman Aff. Ex. 10 at 1. Kill then reiterated the need for the Board Reduction Plan, stressing that "*[i]t will be a solid 4-2 after that, and [Paulus] and [Roche] will still control the Nominating Committee.*" Stuhlman Aff. Ex. 11 at 1 (emphasis added). This was an explicit reference to preserving Board control.

The outcome might have been different if the directors had acted before Pell sent the February 16 Letter. *See Openwave Sys., Inc. v. Harbinger Capital P'rs Master Fund I, Ltd.*, 924 A.2d 228, 242-44 (Del. Ch. 2007) (applying business judgment rule to

39

decision to reduce size of board to eliminate vacant seats where directors acted on a clear day with no proxy contest imminent). Under the present circumstances, Pell has established a reasonable probability of showing successfully that the Board Reduction Plan is preclusive. Pell has therefore established a reasonable likelihood of success on the merits on a claim for breach of fiduciary duty under the enhanced scrutiny standard.

### b. Adequate Justification

Assuming for the sake of argument that the Board Reduction Plan was not viewed as preclusive, there remains a reasonable likelihood that the Defendant Directors will not be able to establish at trial that the Board Reduction Plan was a sufficiently tailored means to achieve a legitimate end. The Defendant Directors offered three justifications for the Board Reduction Plan. One is illegitimate. The other two were not sufficiently convincing to justify foreclosing a proxy contest.

The Defendant Directors' principal justification for the Board Reduction Plan was framed in the draft report and recommendations of the Nominating Committee that Roche circulated on March 28, 2016. During the Board meeting on March 29, Roche delivered his report, and the Defendant Directors acted on it. The Defendant Directors themselves described the report as "crucial to understanding the thought process of the [Nominating] Committee and the Board as a whole." Dkt. 48 at 28.

In his report, Roche explained the following:

Our ultimate goal is to try to rebuild a board that has the skills to effectively oversee the company's business and management for the benefit of all shareholders and that maximizes a perception of independence in performing those tasks and avoids persons who are perceived as having too close a tie to management or current directors or specific shareholders. . . .

40

To do this effectively will take a careful, thoughtful process that cannot and should not be hurried. The Committee has begun setting out that process, which can include the use of an outside search firm to identify and evaluate candidates in accordance with the criteria and qualifications we set forth. Our initial focus should be to identify the replacement audit committee financial expert.

Roche Aff. Ex. S at 1. He then recommended the Board Reduction Plan, which the Defendant Directors adopted.

As the report demonstrates, the Defendant Directors approved the Board Reduction Plan so that they, rather than the Company's stockholders, could determine who would serve on the Board. In addition to the evidence in Roche's report, the same purpose can be seen in other contemporaneous documents, such as:

- Paulus' response to the draft Nominating Committee report, in which he similarly referred to the Board Reduction Plan in terms of the Defendant Directors determining who would serve on the Board, noting that "it is clear we have work to do to put the board back together again post downsizing." Stuhlman Aff. Ex. 39 at 1.

- An email Roche wrote on March 25, 2016, after Wehrwein's resignation, in which he recommended reducing the Board to five for purposes of the Annual Meeting because "[w]e can then take time to fully evaluate someone to replace [Wehrwein] as the financial statement and audit expert, evaluate the board candidate [Pell] suggested, and evaluate other potential candidates. There simply is not time now for us to do that evaluation properly.**"** Roche Aff. Ex. R at 1.

- An email Kill wrote on February 21, 2016, in which he focused on using the Board Reduction Plan to retain a Board majority and control over the Nominating Committee: "[Stauner] and [Wehrwein] need to do what's right and downsize the Board. *It will be a solid 4-2 after that, and you [Paulus] and [Roche] will still control the Nominating Committee*." Stulhman Aff. Ex. 11 at 1 (emphasis added).

- An email Kill wrote on March 2, 2016, in which he asked Roche about whether he planned to implement a strategy that involved using the Board Reduction Plan to get past the Annual Meeting, then expanding the Board afterwards to add candidates chosen by the Defendant Directors: "I need to understand your [strategy (downsize to 5 or 6 and add later OR add now to replace [Zauberman] and [Stauner])." Stuhlman Aff. Ex. 15 at 1.

41

Unfortunately for the Defendant Directors, the belief that directors know better than stockholders is not a legitimate justification when the question involves who should serve on the board of a Delaware corporation. "The notion that directors know better than the stockholders about who should be on the board is no justification at all." *Mercier*, 929 A.2d at 811; *accord Blasius*, 564 A.2d at 663. "[E]ven a board's honest belief that its incumbency protects and advances the best interests of the stockholders is not a compelling justification. Instead, such action typically amounts to an unintentional violation of the duty of loyalty." *Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 602 (Del. Ch. 2006) (footnote omitted).

The Defendant Directors' secondary justifications fare no better. During their testimony, the Defendant Directors cited the cost savings from having fewer directors and the greater efficiency of a smaller board. Although there are references in the record to these benefits, they did not drive the Board Reduction Plan. They were embellished for purposes of litigation. *Cf. Mercier*, 929 A.2d at 807 (explaining that enhanced scrutiny is "useful in exposing pre-textual justifications").

As with many litigation constructs, the secondary justifications were built around grains of truth. The Defendant Directors testified that during 2015, discussion took place about the possibility of reducing the size of the Board from eight directors to six. The thought seems to have been that Zauberman and Stauner would leave, but the concept was not fleshed out in detail, and Stauner does not recall anyone discussing his departure with him. *See* Stauner Dep. 16-19.

42

When the idea of the Board Reduction Plan re-emerged in February 2016, however, the concept was *not* animated by a desire to reduce costs or make the Board more efficient. With one minor exception,[16] the issue of costs did not appear at all in the internal communications among Kill, Roche, and Paulus. They instead focused on preserving control, and they discussed re-upsizing the Board after the Annual Meeting, showing that cost was not a material factor to them. Similarly, they were prepared to keep the size of the Board at seven if Stauner had not wanted to leave, and then at six until Wehrwein resigned. If cost was the key consideration, it should not have mattered who was departing. For Kill, Roche, and Paulus, however, costs only were worth saving if it meant eliminating a legacy-VSI seat.

References to costs also did not appear in Roche's report from the Nominating Committee on March 29, which provided the basis for the Defendant Directors' actions. Roche cited the need to "rebuild a board that has the skills to effectively oversee the company's business and management" and the desire to carry out that task through "a careful, thoughtful process that cannot and should not be hurried." Roche Aff. Ex. S at 1. If anything, his report implied that the Board Reduction Plan was a temporary step and that the Board would be increasing in size again after the Annual Meeting, albeit with candidates chosen by the directors rather than the stockholders.

---

[16] In an email on February 18, 2016, Kill identified items that he felt the Outside Directors should obtain in return for agreeing to Pell's demand for a new CEO. The first was "[s]maller board to save $ ([Zauberman] and [Stauner] to step down)." Stuhlman Aff. Ex. 6 at 1. As with the discussions about board size in 2015, this reference was in the context of a negotiated resolution.

43

Given the absence of meaningful contemporaneous evidence supporting the cost-savings justification, it can be discounted as pre-textual. Even if valid, the Board Reduction Plan was not sufficiently tailored to that end. If cash had been the issue, the directors could have found other solutions, such as using options or restricted stock. Paulus Dep. 18. The limited magnitude of the cost savings also did not justify the major step of eliminating stockholder choice. The total savings amounted to $40-$50,000 per director, which was "a small percentage" of Cogentix's cash burn. Stauner Dep. 17.

Similar problems undermine the efficiency justification. The notion that a smaller board would be more efficient did not appear in the contemporaneous documents, and it did not make sense either. The board dysfunction was driven by the animosity between Pell and Kill, which forced the Outside Directors to choose sides. A smaller board would still have the same dynamic, making the efficiency justification a non sequitur.

Without legitimate and convincing justifications that are supported by the record, the Defendant Directors resorted in their briefing to asking two rhetorical questions that they claimed have no answers. First, they posited: "Why, if the [Director] Defendants had truly feared the loss of control through a proxy contest, did they not act to fill the vacant Wehrwein seat with another so-called 'Ally' of Kill's?" Dkt. 48 at 43. The factual record suggests a rather obvious response. Filling Wehrwein's seat neither solved the control problem if Pell could run nominees for three seats, nor mattered for the control problem if he couldn't. Under the former scenario, if the Defendant Directors filled Wehrwein's seat and Pell won three seats in a proxy contest, then Board-level control was lost because Pell could create deadlock with a 4-to-4 split. Under the latter scenario, if the Defendant

44

Directors reduced the size of Class I to a single seat, then they would retain a 4-to-2 majority regardless. Filling Wehrwein's seat would make it 5-to-2, but it would not change the outcome for purposes of Board-level control. At the same time, if the Defendant Directors also approved the Board Reduction Plan, as was necessary to protect their Board-level control, then filling Wehrwein's seat would undercut the justifications on which they hoped to rely. They could hardly claim that they reduced the size of the Board to save costs and create a more efficient structure if at the same time they were filling an empty seat. From the standpoint of the Defendant Directors, not filling Wehrwein's seat was good strategy.

Second, the Defendant Directors asked, "Why, if the conspiracy was to maintain or increase the so-called 'Kill Ally' influence on the Board did the [Nominating] Committee and Board choose to nominate Pell, himself, rather than nominating one or more other so-called 'Kill Allies' to be elected on the management-sponsored Class I slate?" Dkt. 48 at 44. The factual record again suggests an answer. The Defendant Directors did not have a reliable alternative candidate. One of the main reasons for adopting the Board Reduction Plan strategy was to get past the Annual Meeting, at which point the Nominating Committee could engage in a leisurely process to identify, vet, and select additional directors. When the time came to nominate candidates in March, the Defendant Directors had a list of names, and they had made some initial calls, but they did not have individuals they felt they could count on. Equally important, as a tactical matter, refusing to nominate Pell would give him an issue for the proxy contest. He already was alleging that the other directors did not own enough equity and were

45

insufficiently aligned with the interests of the stockholders. If the Defendant Directors left him out, he could argue that it further evidenced the disconnect between the Defendant Directors and the stockholders, because the Defendant Directors had decided not to re-nominate the director with the largest economic interest in the Company. As with filling Wehrwein's seat, not nominating Pell also would undercut arguments the Defendant Directors hoped to make by drawing a sharper distinction between the two groups of legacy directors and reinforcing Pell's contention that the Defendant Directors were trying to retain Board control. The smart move was to re-nominate Pell, which is what the Defendant Directors did.

Ultimately, the Defendant Directors approved the Board Reduction Plan because it enabled them to avoid a proxy contest for three seats that could shift control at the Board level. Their contemporaneous communications refer explicitly to the need to maintain control and the concomitant benefit of avoiding a proxy contest. I have assumed for purposes of analysis that the Defendant Directors sought to preserve their control for a selfless purpose, namely to rebuild the Board after the Annual Meeting with candidates that they identified, vetted, and selected. By doing so, however, the Defendant Directors sought to substitute their judgment for that of the stockholders, which Delaware law does not permit.

As with the preclusion analysis, the outcome might have been different if the directors had acted on a clear day. Under those circumstances, justifications like cost savings or the superior dynamics of a smaller board might well have been sufficient. *See Openwave*, 924 A.2d at 242-44. But in this case, the Defendant Directors acted in the

46

face of an anticipated proxy contest. "That defensive action by the [Defendant Directors] compromised the essential role of corporate democracy in maintaining the proper allocation of power between the shareholders and the Board, because that action was taken in the context of a contested election for successor directors." *Liquid Audio*, 813 A.2d at 1132. The plaintiff once again has established a reasonable likelihood of success of a claim for breach of fiduciary duty under the enhanced scrutiny standard.

## B.    Irreparable Harm

The second requirement for a preliminary injunction is a threat of irreparable harm if the injunction is not granted. *Revlon*, 506 A.2d at 179. This requirement is met.

Harm is irreparable unless "alternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) (quotation marks and citations omitted). "Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares." *Telcom-SNI Inv'rs, L.L.C. v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *9 (Del. Ch. Sept. 7, 2001) (quoting *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151 (Del. Ch. Jan. 14, 1991)), *aff'd*, 790 A.2d 477 (Del. 2002). "Harm of that nature must be prevented before a shareholders' meeting in cases where, as here, any post-meeting adjudication might come too late." *Packer v. Yampol*, 1986 WL 4748, at *11 (Del. Ch. Apr. 18, 1986).

Absent an injunction, the Company's stockholders will be prevented from exercising their voting rights by electing three directors at the Annual Meeting. By pre-

47

ordaining the results of the Annual Meeting, the Board Reduction Plan deprives stockholders of their right to vote. "This loss of voting power constitutes irreparable injury." *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *11 (Del. Ch. Aug. 27, 1987) (Allen, C.); *see Third Point LLC v. Ruprecht*, 2014 WL 1922029, at *25 (Del. Ch. May 2, 2014) (explaining that had the plaintiffs shown a reasonable likelihood of success on the merits, "it also likely would have been able to demonstrate a threat of imminent, irreparable harm, due to its reduced likelihood of winning the election").

## C.    The Balancing Of The Equities

The final element of the injunction standard is a balancing of the equities:

> [A] court must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a . . . remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.

*Lennane v. ASK Computer Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. Oct. 11, 1990) (Allen, C.). Here, the balancing decidedly favors an injunction.

"[T]he interests of corporate democracy on which [stockholders] rely have the greatest effect on the balance of the equities . . . ." *Sherwood v. Ngon*, 2011 WL 6355209, at *15 (Del. Ch. Dec. 20, 2011). "Shareholder voting rights are sacrosanct. The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm." *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012). "The harm threatened here is to the corporate electoral process, a process which carries with it the right of shareholders to a meaningful exercise

48

of their voting franchise and to a fair proxy contest with an informed electorate." *Packer*, 1986 WL 4748, at *11.

Conversely, the Defendant Directors will face no hardship from an injunction. The risk that stockholders may elect directors whom the incumbents disfavor is no harm at all. Even when the incumbents themselves could be voted out of office, that fact does not support a claim of hardship. *See Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del. Ch. 1987) ("The incumbent directors have no vested right to continue to serve as directors and therefore will suffer no harm if they are defeated.").

## D.    A Limitation On The Scope of the Injunction

During the injunction hearing, the Defendant Directors argued that the court should distinguish between (i) the reduction in the size of the Board from eight to seven, which eliminated the vacancy in Class II created by Wehrwein's resignation, and (ii) the reduction in the size of the Board from seven to five, which will become effective at the Annual Meeting, and which also will reduce the number of Class I seats from three to one. The Defendant Directors argued that any injunction should be limited to the second phase.

Pell did not oppose the parsing of the Board Reduction Plan in this fashion, and the distinction does not appear harmful to stockholder interests. The Class II seat formerly held by Wehrwein is not up for election at the Annual Meeting, so eliminating it does not limit the stockholders' ability to elect new directors. To the extent it has any effect on the composition of the Board, it reduces the number of seats held by the incumbents. That in turn increases the potential influence of any newly elected directors,

49

which enhances rather than impairs stockholders voting rights. If Pell had shown that the stockholders could fill Wehrwein's vacancy at the Annual Meeting, then the analysis would be different.

Consequently, as the Defendant Directors requested, the preliminary injunction does not extend to the elimination of the Class II seat formerly held by Wehrwein. Pending further developments, the Board has seven seats.

## III.    CONCLUSION

Until this court renders a final decision on the merits, the Defendant Directors are enjoined from completing the Board Reduction Plan by reducing the number of seats from seven to five and fixing the number of Class I seats at one. The Board has seven seats, with three allocated to Class I, two allocated to Class II, and two allocated to Class III.

This court's granting of a preliminary injunction does not intimate any view about the pending proxy contest. Having reviewed the evidence in this case, I am inclined to believe that the merits of Pell's platform and the strategic questions that have divided the Board are matters on which reasonable minds could disagree. For good or ill, the Company's stockholders—not this court—have the right to elect the individuals who, as members of the board, will direct and oversee the business and affairs of the corporation. *In re Gulla*, 115 A. 317, 318 (Del. Ch. 1921). The preliminary injunction preserves their right to do that, pending the final disposition of the case.