# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BHP PARTNERS CO., LP and BRADFORD HEALTH SERVICES, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> CHANDLER KEEL, <br><br> Defendant. | C.A. No. 2025-1289-MTZ |

## ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

WHERAS, having considered the Motion for Preliminary Injunction (the "Motion") filed by Plaintiffs BHP Partners Co., LP (the "Partnership") and its wholly owned subsidiary Bradford Health Services, LLC ("Bradford" and with the Partnership, "Plaintiffs), and related briefing, it appears that:[1]

---

[1] Citations in the form "POB" refer to Plaintiffs' Opening Brief in support of Motion for a Preliminary Injunction, available at C.A. No. 2025-1289-MTZ, docket item ("D.I.") 65. Citations in the form "DAB" refer to Defendant Chandler Keel's Answering Brief in Opposition of Plaintiffs' Motion for Preliminary Injunction, available at D.I. 73. Citations in the form "PRB" refer to Plaintiffs' Reply Brief in Further Support of Their Motion for a of Preliminary Injunction, available at D.I. 78. Citations in the form "Mot." refer to Plaintiffs' Motion for a Preliminary Injunction, available at D.I. 3. Citations in the form "A____" refer to the Parties' Appendix of Documents relied on in briefing the Motion, available at D.I. 66, D.I. 67, D.I. 68, D.I. 69, D.I. 74, D.I. 75, and D.I. 78. Citations in the form "Marsh Aff." refer to the Affidavit of Rob Marsh, available at D.I. 65. Citations in the form "Keel Aff." refer to the Affidavit of Chandler Keel in Support of His Opposition to Plaintiffs' Motion for Preliminary Injunction, available at D.I. 73. Citations in the form "Marsh Supp. Aff." refer to the Supplemental Affidavit of Rob Marsh, available at D.I. 77. Citations in the form "ISA" refer to the Incentive Securities Agreement, available at D.I. 75, App'x Part 4 at A0195–210.

A. Bradford owns and operates facilities that provide addiction treatment and recovery services.[2] Bradford's facilities offer services across a broad continuum of care, including inpatient treatment, detox, partial hospitalization, outpatient treatment, and continuing care services.[3] Bradford currently operates facilities in Alabama, Florida, Indiana,[4] Mississippi, North Carolina, Tennessee, and Texas.[5] When this action began Bradford had considered expanding its operation to several additional states, including Virginia, Indiana, and Ohio.[6] Bradford's facilities accept a broad range of payment options, including private pay, commercial insurance, and Medicaid.[7] The Partnership sits atop a number of "Consolidated Entities," each of which "are engaged in the business of owning and operating treatment facilities or owning land or real estate used for treatment facilities."[8]

---

[2] Marsh Aff. ¶¶ 2–5.

[3] *Id*. ¶ 11; *see* The Bradford Difference, https://bradfordhealth.com/about/ (last visited June 9, 2026).

[4] After commencing this action, Plaintiffs acquired a facility in Indiana and now operate the Parkdale facility in Chesterton, Indiana. A1909–12, Marsh Dep. 157–69.

[5] D.I. 12 [hereinafter "Ans."] ¶14 (admitting Bradford operates facilities in "Alabama, Florida, Mississippi, North Carolina, Tennessee, and Texas."); A1909, Marsh Dep. 157 (confirming Bradford acquired the Parkdale facility in Indiana); Marsh Aff. ¶ 4; Explore our Location and Services, https://bradfordhealth.com/locations/(last visited June 9, 2026).

[6] D.I. 1 [hereinafter "Compl."] ¶ 14; Marsh Aff. ¶ 5; A1909–12, Marsh Dep. 157–69.

[7] Marsh Aff. ¶ 6.

[8] Marsh Supp. Aff. ¶¶ 3, 4, Ex. A.

B.     On March 30, 2023, defendant Chandler Keel accepted Bradford's employment offer to serve as its Vice President of Business Development.[9]  His responsibilities included "executing a strategy of growth" and "assuming overall leadership of day-to-day financial and control operation of [Bradford]."[10]

C.     Keel's offer letter ("Offer Letter") included key terms of Keel's employment, including an annual base salary of $200,000, a performance bonus capped at 20% of that salary, equity awards, benefits, management responsibilities, and terms governing his termination.[11]  The Offer Letter barred Keel from competing with Bradford during his employment and for six months thereafter.[12]  The Offer Letter's noncompete applied to "any business conducted or specifically planned to be conducted by the Company."[13]  Keel negotiated the Offer Letter terms directly with Bradford's then-Chief Executive Officer ("CEO") and agreed to the noncompete in exchange for the right to a severance payment, if terminated without cause, and for the ability to renegotiate his bonus structure after six months of

---

[9] Ans. ¶ 23; A0597–600; *see* A0117–20.

[10] A0118.

[11] Ans. ¶ 24; A0117–20.

[12] Ans. ¶ 25; A0117–20.

[13] Ans. ¶ 26; A0117–20.

employment.[14]  The Offer Letter requested Keel to execute and revert if the terms were acceptable, which he did.[15]

D.      The Partnership granted Keel equity units in August 2023.[16]  In connection with that transaction, Keel signed an Incentive Securities Agreement ("ISA") and joinder agreement ("Joinder Agreement") by which Keel became a party to and agreed to be bound by the Partnership's operative partnership agreement (the "LPA").[17]  The ISA includes an integration clause incorporating the terms of

---

[14] A0597–602.  On March 29, Keel emailed Bradford's CEO noting the Offer Letter included a noncompete provision, but did not mention severance as previously discussed. A0597.  In response, the CEO noted "I did not discuss non-compete at all" and instructed Keel to discuss that provision with the Vice President ("VP") of Human Resources ("HR"). *Id*.  That afternoon, the VP of HR spoke with Keel about the Offer Letter's noncompetition provision.  A0598.  Keel then emailed the VP of HR asking him to "disregard our prior conversation" and explained he would accept the offer if the Offer Letter was revised to include a 3-month severance payment in the event he was terminated without cause and the right to renegotiate the bonus structure after 6 months of employment.  A0601. Bradford agreed to Keel's requested revisions, which are reflected in the Offer Letter. A0600–01; A0117 ("[Keel] will have the option to renegotiate the bonus incentive plan after 6 months of employment in conjunction with Board direction and approval."); A0118 (providing "a severance benefit equal to three months' Base Salary").  When asking for the revision, Keel noted the noncompete provision need not be changed.  A0601.

[15] A0119–120; Ans. ¶¶ 23–26.

[16] *See generally*, ISA; Ans. ¶¶ 27–31.

[17] ISA; *id*. § 8(e); *id*. at Joinder; Ans. ¶¶ 27–33.

4

the LPA.[18]  The ISA also includes Delaware choice of law and forum selection provisions.[19]

E.  In that transaction, Keel agreed to be bound by the restrictive covenants in the LPA.[20]  The Partnership had narrowed those covenants in 2023.[21]  The noncompete and confidentiality covenants are relevant here.[22]  The LPA is governed by Delaware law and includes a forum selection clause designating this Court or the District Court for the District of Delaware.[23]

F.  The noncompete provides, in relevant part:

Noncompetition. During the Restricted Period, each Restricted Partner shall not, directly or indirectly, in any manner, anywhere in the Applicable Area (whether on his or her own account, or as an employee, director, consultant, contractor, agent, partner, manager, joint venturer, owner, operator or officer of any other Person, or in any other capacity) engage in the Business, or own any interest in, manage, control, provide financing to, participate in (whether as an owner, operator, manager,

---

[18] ISA § 8(c) ("This Agreement, those document expressly referred to herein (including the LP Agreement and Recipient's employment agreement, if any, with the Partnership or any of the other Consolidated Entities) and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral which may have related to the subject matter hereof in any way.").

[19] *Id*. § 8(h).

[20] Ans. ¶¶ 27–36; A0603–07; ISA § 8(e).

[21] A0603 (explaining the LPA was amended to narrow the geographic scope of the noncompete from a nationwide prohibition to territorial restriction applicable where Bradford operates and "[a]ny prospective state in which Bradford has evaluated or considered strategically expanding into within the past 6 month and where the employee received confidential information relating to these expansion plans"); Marsh Aff. ¶ 12.

[22] A0049–50; Compl. ¶¶ 66–73.

[23] A0053–54 (§ 14.7); Ans. ¶¶ 8, 10, 57–58.

5

consultant, officer, director, employee, investor, agent, representative or otherwise), or be employed by, consult with or provide services to any Competitive Business or assist any Person in doing any of the foregoing . . . .[24]

For a "National Restricted Partner" like Keel,[25] the "Restricted Period" includes the duration of employment and two years thereafter.[26] "Business" means "owning and operating residential and outpatient substance use disorder facilities . . . , (b) owning of real estate" to use as treatment facilities, "and (c) any other business or activity in which any Consolidated Entity has engaged in, or actively considered providing or engaging at any time during the three years prior" to Keel's departure.[27] Competitive Business means "any Person engaged in any aspect of the Business (other than the Consolidated Entities) or any business that, directly or indirectly, competes with the Business."[28] And the Applicable Area is:

> (i) any state in which the Partnership or any of its Subsidiaries operates a facility as of such date (which, as of the date hereof, includes the States of Alabama, Arkansas, Mississippi, North Carolina, and Tennessee), (ii) any state which the Partnership or any of its

---

[24] A0050 (§13.2).

[25] Ans. ¶ 27; ISA at Recital.

[26] A0114 (amending the definition of "Restricted Period" in the LPA to mean "with respect to a National Restricted Partner, the period during which such National Restricted Partner is employed or engaged by the Partnership or its Subsidiaries and the two (2) year period thereafter").

[27] A0007.

[28] A0008.

Subsidiaries has evaluated or formally considered expanding into within the six (6) months prior to such date to the extent such National Restricted Partner received Confidential Information with respect to such evaluation or consideration , and (iii) within the two hundred (200) mile radius of any facility operated by the Partnership or its Subsidiaries during the six (6) month period prior to the termination of such National Restricted Partner's employment or engagement with the Partnership and its Subsidiaries; and (B) with respect to an Facility Restricted Partner, within the two hundred (200) mile radius of the specific facility or facilities at which such Facility Restricted Partner provided services to or on behalf of the Partnership or its Subsidiaries during the six (6) month period prior to the termination of such Facility Restricted Partner's employment or engagement with the Partnership and its Subsidiaries.[29]

G.      In the confidentiality provision, Keel agreed "not to disclose to any third party either for his or its own account or for the benefit of others, any Confidential Information without the Board's prior written consent" subject to four exceptions, none of which are relevant here.[30]   The LPA defines "Confidential Information" to include "all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (a) related to the Consolidated Entities or their current or potential business, and (b) is not generally or publicly known."[31]   Confidential Information includes "information, observations and data obtained . . . concerning the business and affairs of the Consolidated Entities and their Affiliates, including information concerning acquisition opportunities

_____

[29] A0113–14.

[30] A0049–50 (§ 13.1).

[31] *Id*.

7

considered or pursued by the Consolidated Entities, the . . . methodologies and methods of doing business utilized by the Consolidated Entities, . . . or integration processes of the Consolidated Entities . . . ."[32]

H.     On January 1, 2024, Keel was promoted to Chief Marketing Officer ("CMO") and his base salary was increased to $230,000.[33]

I.     In 2025, Keel began casting about for employment with other addiction treatment providers.[34]  In January 2025, Keel submitted his resume to the CEO of Recovery Centers of America ("RCA") and expressed interest in "continuing the opportunity to identify [] what capacity I can be a resource to the Company."[35]  RCA operates addiction treatment facilities in Delaware, Florida, Illinois, Indiana, Maryland, Massachusetts, New Jersey, Pennsylvania, and South Carolina.[36]  Like Bradford, RCA offers a broad range of services, including inpatient treatment, detox,

---

[32] *Id.*

[33] Marsh Aff. ¶ 12; Ans. ¶17.

[34] A0742–43.

[35] A0880–84.  Keel's resume described his role with Bradford as "[p]lay[ing] a pivotal role in M&A activities, conducting market analyses and due diligence for acquisitions that expanded service capacity."  A0882 ("Designed and executed a territory realignment plan, leading to 22% increase in field-based referrals.").

[36] RCA Locations, https://recoverycentersofamerica.com/locations/ (last visited June 9, 2026).  Plaintiffs subpoenaed nonparty RCA (D.I. 44); RCA referred Plaintiffs to their website for an accurate list of their states of operation.  A1173–74.

partial hospitalization, outpatient treatment, aftercare, and medication-assisted treatment.[37] RCA's facilities accept both commercial insurance and Medicaid.[38]

J.      Later that spring, Keel told Bradford he was considering accepting a position with Alsos Behavioral Health ("Alsos").[39] Alsos offers programs that include inpatient treatment, detox, outpatient treatment, and medication-assisted treatment.[40] Alsos accepts commercial insurance and Medicaid.[41] Alsos owns and operates addiction treatment facilities in Arkansas, Colorado, Indiana, Kentucky, and Ohio.[42] Bradford responded by offering to increase his annual compensation to $470,000 and additional equity.[43] Keel accepted that offer, and told the CEO he was "happy to be firmly planted here moving forward."[44]

---

[37] A2132, Puckett Dep. 17; Addiction Treatment Programs, https://recoverycentersofamerica.com/treatment (last visited June 9, 2026).

[38] A2133, Puckett Dep. 18 (explaining RCA is "mostly commercial payor focus" but accept Medicaid at their facilities in Massachusetts, Pennsylvania, and Indiana).

[39] A0608–10. Keel's initial contact was with Landmark Recovery; Landmark subsequently underwent a bankruptcy restructuring, and Alsos assumed operational control of Landmark's facilities on July 1, 2025. A0352–62. Alsos's CEO testified Keel exclusively provided services to Alsos. A2048, Boyle Dep. 162; *but see* Ans. ¶ 52 ("Mr. Keel's work for Landmark . . . ."); *see* A1446–47, Keel Dep. 179–83.

[40] A2013–14, Boyle Dep. 25–27; *see* About Us, (https://alsosbehavioralhealth.com/about/ (last visited June 9, 2026).

[41] A2013–14, Boyle Dep. 25–29.

[42] A2014; Boyle Dep. 29. Plaintiffs subpoenaed nonparty Alsos (D.I. 44); Alsos referred Plaintiffs to their website for an accurate list of their states of operation. A1160–61. Location, https://alsosbehavioralhealth.com/locations/ (last visited June 9, 2026).

[43] A0608–11.

[44] A0613.

K.     But two days later, Keel told Alsos he had not yet made a "finalized decision" on whether to stay at Bradford, but that even if he did, he would still have "ample time" for Alsos and was "still comfortable moving forward" with discussions regarding a chief revenue officer role.[45]   Alsos's CEO responded:  "I'm definitely not comfortable with you remaining CMO at Bradford and trying to be our CRO. That's almost the exact scenario I was trying to avoid."[46]   Keel reengaged in early June, and Alsos's CEO expressed his interest that Keel "be full time at [Alsos]" and shared a proposed compensation package that might secure Keel as much as $1,000,000 per year.[47]   Keel countered by emphasizing his desire to be self-employed and proposed he work for Alsos as a contractor.[48]   On June 10, Keel and Alsos's CEO executed a Consulting Services Agreement ("CSA") by which Keel would provide consulting for 180 days, beginning on July 14, in a role "equivalent to a full-time Chief Marketing Officer."[49]   Keel would be paid over $7,000 per week.[50]   The CSA also granted Keel the right to transition from a consultant to an

---

[45] A2228; *see* A0633–42.

[46] A2228.

[47] A0643–45.

[48] A0644.

[49] A0647–60.

[50] A0649.  The CSA further provided that if Keel elected to be classified as a W-2 employee Alsos agreed to convert the consultant fee to an annualized base salary of $400,000. *Id.*

employee at his election.[51]   Keel also agreed to a Non-Disclosure and Non-Use Agreement with Alsos.[52]

L.    In the meantime, on May 14, Keel exchanged messages with an executive at Advaita Health Ventures LLC ("Advaita") regarding a possible "partner role."[53]   Advaita operates three addiction treatment facilities in North Carolina.[54] Advaita offers a range of services at its facilities, including partial hospitalization, inpatient treatment, medication-assisted treatment, outpatient treatment, and talk therapy.[55]

M.    On June 19, Keel gave Bradford his notice of resignation.[56]  The notice claimed he was resigning for "good reason" and requested Bradford waive the noncompete and provide Keel six months' severance pay.[57]  Keel also provided he

---

[51] A0647.

[52] A0657–59.  Keel drafted restrictive covenants for the consulting contracts he entered with Alsos, Advaita, and RCA.  A0650; A0658; A0722; A0726; A0902; A1448, 1462, 1471, Keel Dep. 188, 242–43, 279.

[53] A2185.

[54] A1629, Johnson Dep. 170–71; Our Ventures, https://advaita.health/ (last visited June 9, 2026).

[55] A1591, Johnson Dep. 19 (explaining Advaita provides "outpatient behavioral help including psychiatry, therapy, partial hospitalization, and intensive outpatient programming, as well as transcranial magnetic stimulation and ambulatory detoxification."); *see* Services, https://aimwellbeing.com/services/ (last visited June 9, 2026).

[56] A0618–19.

[57] *Id*.

would continue to work for Bradford for 30 days to facilitate the transition of his responsibilities.[58]

N.    One week later, Alsos's CEO emailed the Alsos team about an upcoming site visit schedule and announced "[Keel] will be our Chief Revenue Officer, overseeing Business Development, Admissions, and Marketing."[59]  Keel responded by attaching a "site visit report that *we* developed," noting his expectation that Alsos would implement a similar system of oversight.[60]  That site visit report was prepared by Bradford for its Trinity River Recovery facility.[61]

O.    Keel's last day at Bradford was July 11.[62]  That day, Bradford's CEO denied Keel's request to waive the noncompete.[63]  Instead, the CEO reminded Keel about it, noting, "[Y]ou are restricted for a period of two years from competing directly or indirectly, against the Company."[64]

P.    On August 19, Keel and Advaita entered a Services Agreement under which Keel agreed to provide certain "onsite engagement" for a fixed fee of

---

[58] A0618.

[59] A0661–62.

[60] A0661–65.

[61] *Id.*

[62] A0620; Ans. ¶ 16.

[63] A0620.  Bradford also denied Keel's request for six months of severance, explaining his departure did not constitute "Good Reason."  *Id.*

[64] *Id.*

$6,000.[65]  Keel also agreed to a Mutual Non-Disclosure and Non-Use Agreement with Advaita.[66]  The next week, Keel gave Advaita a CEO/Executive Director Scorecard, Business Development Manual, and Admissions Manual, each of which Bradford developed and used during Keel's tenure.[67]  Keel's cover email noted the attached content was "shared for your eyes only[.]"[68]

Q.  In the meantime, on August 22, Bradford repurchased Keel's vested Partnership units for $110,000.[69]

R.  On September 11, Keel and RCA entered a Services Agreement by which he agreed to deliver a feasibility and market strategy analysis of five states to "cover key themes including but not limited to geography and market access."[70] RCA agreed to pay Keel a $35,000 consultant fee.[71]

S.  On October 27, Bradford sent Keel a cease-and-desist letter demanding he comply with the LPA's restrictive covenants.[72]  The letter asked Keel to provide

---

[65] A0721–31; A0740–41.

[66] A0725–27.

[67] A1176–273.

[68] A1176.

[69] A0622; Ans. ¶ 37.

[70] A0900–10.

[71] A901 (providing half the consultant fee is due upon execution of the Services Agreement).

[72] A1138–50 (attaching the First Amendment to the LPA Agreement to the cease-and-deist letter).

information about his work for Alsos, submit an attestation he was in compliance with the restrictive covenants, and to immediately cease any activities violative of the restrictive covenants.[73]

T.    On November 7, Plaintiffs filed their Verified Complaint for Injunctive Relief and Damages (the "Complaint"), alleging: (i) breach of the LPA's restrictive covenants; and (ii) breach of the Offer Letter's restriction on competition and use of Bradford's confidential information.[74]  Plaintiffs simultaneously moved for a preliminary injunction and for expedition.[75]  The parties stipulated to expedite the proceedings.[76]  On May 11, the Court heard argument on the Motion and took it under advisement.[77]

U.    The Motion seeks three forms of preliminary injunctive relief.  It asks the Court enjoin Keel from working "directly or indirectly, in any manner" for Alsos, RCA, and Advaita."[78]  It also seeks to enjoin Keel from working in states where Bradford operates a facility and states that were evaluated for expansion during Keel's last six months of employment, which Plaintiffs list as Florida, Texas, North

---

[73] A1140–41.

[74] Compl. ¶¶ 54–88.

[75] D.I. 2; D.I. 3.

[76] D.I. 11.

[77] D.I. 80.

[78] D.I. 77 at Proposed Order.

Carolina, Alabama, Tennessee, Virginia, Indiana, Ohio, and Mississippi.[79] Plaintiffs also seek to enjoin Keel from using or disclosing Confidential Information, as defined in the LPA.[80]

V.     To obtain a preliminary injunction, the movant must demonstrate (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction.[81]  "A party showing a 'reasonable probability' of success must demonstrate 'that it will prove that it is more likely than not entitled to relief.'"[82]  The reasonable likelihood standard "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made."[83]

---

[79] *Id.*

[80] *Id.*  Because the relief Plaintiffs seek can be granted under the LPA, I limit my analysis to the enforceability and application of the LPA's restrictive covenants.  I do not reach any restrictive covenants in the Offer Letter.

[81] *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986)); *see also Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del. 1987).

[82] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls. & Sanitation Empls. Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014) (quoting *Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. Sept. 30, 2014)).

[83] *Pell*, 135 A.3d at 783 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)).

W.     "This Court has broad discretion to grant or deny a preliminary injunction."[84] But a preliminary injunction "is not granted lightly," and "the moving party bears a considerable burden in establishing each of these necessary elements."[85] "Nevertheless, while some showing is required as to each element, there is no steadfast formula for the relative weight each of these three factors deserves."[86]

X.     "Delaware adheres to the 'objective' theory of contracts, [meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[87] The Court will "give effect to the plain-meaning of the contract's terms and provisions,"[88] "will read a contract as a whole[,] and . . . will give each provision and term effect, so as not to render any part of the contract mere

---

[84] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010) (citing *Data Gen. Corp. v. Digit. Comput. Controls, Inc.,* 297 A.2d 437, 439 (Del. 1972)).

[85] *Fletcher*, 2010 WL 1223782, at *3 (alteration omitted) (quoting *La. Mun. Police Empls. Ret. Sys. v. Crawford,* 918 A.2d 1172, 1185 (Del. Ch. 2007)).

[86] *Kodiak Bldg. P'rs, LLC v. Adams,* 2022 WL 5240507, at *3 (Del. Ch. Oct. 6, 2022); *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917 (Del. Ch. Nov. 5, 2004) ("While some showing is required as to each element, there is no steadfast formula for the relative weight each deserves. Accordingly, a strong demonstration as to one element may serve to overcome a marginal demonstration of another.").

[87] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[88] *Id.* at 1159–60.

surplusage."[89] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning," without resorting to extrinsic evidence.[90]

Y.     Restrictive covenants are enforceable when they (i) are valid under general principles of law, (ii) are reasonable in their scope and effect, (iii) bear a reasonable relationship to the advancement of legitimate interests, and (iv) survive a balancing of the equities.[91]  "A non-competition agreement will only be enforced to protect the legitimate economic interests of the employer. Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse."[92]  "Delaware courts evaluate restrictive covenants 'holistically and in context.'"[93]  Under Delaware law, "the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the

---

[89] *Id.* at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

[90] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[91] *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015); *TriState Courier & Carriage, Inc. v. Berryman,* 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004).

[92] *Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992).

[93] *Cleveland Integrity Servs., LLC v. Byers*, 2025 WL 658369, at *8 (Del. Ch. Feb. 28, 2025) (quoting *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 753 (Del. Ch. 2023), *aff'd in part, rev'd in part*, 332 A.3d 472 (Del. 2024)).

covenants are designed to protect."[94]  Delaware courts find the geographic scope of a noncompete to be "reasonable" where the restricted area "covers the market where the covenantee has economic interests."[95]  When, as here, "a restrictive covenant advances an employer's interest in expanding into new markets, a court may also assess the covenant's scope based on its reasonableness at the time of enforcement."[96]

IT IS HEREBY ORDERED this 16th day of June, 2026, that:

1.     Plaintiffs' Motion is GRANTED.  Plaintiffs have made the required showing on their claims Keel violated the LPA's restrictive covenants by disclosing Confidential Information and providing services for three Competitive Businesses.[97]

2.     The LPA features a Delaware choice of law provision.[98]  "Delaware follows the Restatement (Second) of Conflicts of Laws, which provides a contractual choice of law will generally control."[99]  The Restatement recognizes exceptions to

---

[94] *Weichert Co. of Pennsylvania v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007).

[95] *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *5 (Del. Ch. Mar. 16, 2023).

[96] *Cleveland Integrity Servs.*, 2025 WL 658369, at *8; s*ee Kan-Di-Ki,* 2015 WL 4503210, at *20 (reasoning the noncompete's scope was reasonable in large part because, at the time of enforcement, the employer's business had expanded into much of the restricted area where it previously did not provide services).

[97] Compl. ¶¶ 66–88.

[98] A0053–54 (§ 14.7).

[99] *HighTower Hldg., LLC v. Gibson*, 2023 WL 1856651, at *5 (Del. Ch. Feb. 9, 2023); *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *7 (Del. Ch. Oct. 17, 2018); *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *2 (Del. Ch. Jan. 28, 2015);

that general principle, by which "the law of the default state—i.e., that which would apply absent a choice of law provision—will govern in certain circumstances."[100] Under one exception, the law of the default state will apply if "the default state has a public policy under which a contractual provision would be limited or void" and the default state "has a materially greater interest in the issues—enforcement (or not) of the contract at hand—than Delaware."[101] Keel acknowledges the LPA is governed by Delaware law and does not argue another state's law should apply.[102] Plaintiffs are both Delaware entities and Keel is a resident of Kentucky, which I presume to be the default state.[103] Under Kentucky law, "restrictive covenants are held valid, and not against public policy, unless the particular circumstances of the case would cause serious inequities to result."[104] As far as I can tell, Kentucky has no policy against the enforcement of restrictive covenants and does not conflict with Delaware law. I will apply Delaware law.

---

Restatement (Second) of Conflict of Laws § 187(1) (1971). (providing that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue").

[100] *HighTower Hldg.*, 2023 WL 1856651, at *5.

[101] *Ascension*, 2015 WL 356002, at *2–*3.

[102] DAB at 30.

[103] Ans. ¶¶ 5–7.

[104] *Mountain Comprehensive Health Corp. v. Gibson*, 2015 WL 1194508, at *2 (Ky. Ct. App. Mar. 13, 2015) (citing *Daniel Boone Clinic, P.S.C., v. Dahhan,* 734 S.W.2d 488, 489 (Ky. Ct. App. 1987)).

**Reasonable Likelihood Of Success**

3.      There is no dispute that the LPA is a valid and binding contract.[105]

4.      Plaintiffs have shown it is reasonably likely that the noncompete is reasonable in its scope and effect, and supported by Plaintiffs' economic interests. When determining the enforceability of a noncompetition restriction the Court reviews duration and geographic scope together.[106]  The Court enforces restrictive covenants where the employer has a "strong economic interest."[107]  "Delaware law does not impose a strict requirement that the area covered by the covenant map perfectly onto the geographical area of the plaintiff's business."[108]  The Court has found even geographically "expansive" restrictions to be reasonable where "the covenant appropriately covers the market where the covenantee has economic interests."[109]

---

[105] *See* DAB 28–69 (challenging enforceability of the LPA's restrictive covenants, not the validity of the LPA).

[106] *Payscale Inc. v. Norman*, ---A.3d----, 2026 WL 774876, at *3 (Del. Mar. 19, 2026).

[107] *Centurion Serv. Grp., LLC v. Wilensky*, 2023 WL 5624156, at *5 (Del. Ch. Aug. 31, 2023).

[108] *Kan-Di-Ki*, 2015 WL 4503210, at *20; *see Cleveland Integrity Servs.*, 2025 WL 658369, at *10–11; *Intertek Testing Servs.*, 2023 WL 2544236, at *4.

[109] *Derge v. D&H United Fueling Sols., Inc.*, 2025 WL 3511065, at *7 (Del. Ch. Dec. 8, 2025) (quoting *Intertek Testing Servs.*, 2023 WL 2544236, at *5).

5.     The noncompete prohibits Keel from competing in the Business and working for a Competitive Business, in the Applicable Area, for two years.[110] Delaware has repeatedly found covenants of two years or more to be enforceable.[111] For Plaintiffs' actual operations, the noncompete's geographic scope is limited to 200 miles around "any facility operated by the Partnership" during the six month period prior to the cessation of employment, or any state in which the Partnership or any of its Subsidiaries operates a facility.[112]  For potential future operations, the

---

[110] A0050 ("During the *Restricted Period*, each Restricted Partner shall not, directly of indirectly, in any manner, anywhere in the Applicable Area . . . engage in the *Business*, or . . . provides service to any *Competitive Business* . . . .") (emphasis added); A0114 ("'Restricted Period' means (a) with respect to a National Restricted Partner, the period during which such National Restricted Partner is employed or engaged by the Partnership or its Subsidiaries and the two (2) year period thereafter[.]").

[111] *See Weichert*, 2007 WL 4372823, at *3 ("Covenants of two-years' duration are consistently held to be reasonable."); *Tristate*, 2004 WL 835886, at *11 (enforcing a two-year restrictive covenant); *Kan-Di-Ki*, 2015 WL 4503210, at *19 (enforcing a five-year noncompete); *Singh v. Batta Env't Assocs., Inc.*, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003) (finding a two-year to be reasonable where the projects performed by the employee often requires one to two years to complete); *see also O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *5 (Del. Super. Jan. 12, 2011) (enforcing a four-year noncompete that covered the entire United States); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007) (enforcing a five-year noncompete).

[112] A0113–14 (defining Applicable Area).  Plaintiffs do not seek relief under the radius restriction at this stage, but I must still consider its effect for purposes of the noncompete's enforceability.  PRB at 14; *FP UC Hldgs.*, 2020 WL 1492783, at *8 ("While, in some circumstances, a court may use its discretion to blue pencil an overly broad non-compete to make its restrictions more reasonable, this court has also exercised its discretion in equity not to allow an employer to 'back away from an overly broad covenant by proposing to enforce it to a lesser extent than written.'" (citing *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969), and then quoting *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *10 (Del. Ch. Mar. 16, 2011))).

noncompete's geographic scope is limited to states the Partnership or any of its Subsidiaries evaluated for expansion during the last six months of Keel's employment, to the extent Keel received Confidential Information.[113]

6. The noncompete's temporal and geographic restrictions protect Plaintiffs' legitimate business interests. As the CEO of Bradford's Red Oak facility put it, the addiction treatment space is "a copycat industry" where market participants eagerly adopt successful practices.[114] Keel's role at Bradford exposed him to significant competitive information. He was involved in all aspects of the Bradford organization; upon his resignation, his duties across his vast portfolio had to be distributed among several individuals.[115] And drawing competitive zones by state makes sense here, as Plaintiffs' business model relies on the insurance environment, which is set at the state level.[116]

---

[113] A0113–14.

[114] A1712, Masterson Dep. 87.

[115] A1893, Marsh Dep. 90–92; A1927, Marsh Dep. 227 ("Q: Are there any lines of business that Bradford had during Mr. Keel's tenure that Bradford doesn't believe Mr. Keel participated in? Is there anything that operated outside of Mr. Keel's involvement? A: Not that I can think of. I think everything because of his position, because of his reach, all services that we offered he had some influence or input in.").

[116] A0398 (noting that pursuing Medicaid payors may be "[d]esirable depending on state reimbursement rates"); A0396 (explaining Plaintiffs' growth plan includes assessments of "market demand," "scalability potential," "payor environment," and "regulatory compliance"); *see* A0306 (evaluating Indiana's payor mix).

7.      As for expansion plans, Plaintiffs also operate and evaluate expansion opportunities at a state-wide level, not a facility level.[117]  The noncompete is tethered to Plaintiffs' business plan, and protects only those expansions for which Keel actually received confidential information.[118]  Keel's CMO role at Bradford justifies this tailored restriction:  his responsibilities included "the strategic focus of the business development efforts of the organization, evaluation of markets" to enter, and the "evaluation of specific acquisition targets[.]"[119]

8.      Keel offers several arguments as to why the noncompete is unenforceable.[120]  He contends it improperly prohibits him from serving in any role, as opposed to the role like the one he held at Bradford, and contends that prohibition amounts to an unreasonable "any capacity" restriction.[121]  Keels relies on this Court's decisions in *Daxco, LLC v. Timm*[122] and *Kodiak Building Partners, LLC v. Adams*[123] to argue the Court will only enforce a restrictive covenant where it is tailored to the employee's role.  But neither case stand for the proposition that "any

---

[117] A1909–10, Marsh Dep. 154–61; *see* A1810–12, Vellani Dep. 110–21.

[118] *Payscale*, 2026 WL 774876, at *7, n.53 (Del. Mar. 19, 2026) (finding a noncompete that implicated "proposed businesses" to be appropriately "tailored to [plaintiff's] business interest" where based on a business plan).

[119] A1888, Marsh Dep. 70–71.

[120] *See* DAB at 30–46.

[121] DAB at 31–41.

[122] 2026 WL 172862 (Del. Ch. Jan. 22, 2026).

[123] 2022 WL 5240507 (Del. Ch. Oct. 6, 2022).

capacity" restrictive covenants are *per se* unreasonable. In *Daxco*, the Magistrate rejected the noncompete due to the plaintiff's lack of any economic interest in protecting its affiliates from competition with the defendant, given the plaintiff did not allege the defendant worked outside of one particular business line.[124] Similarly, in *Kodiak*, the Court declined to enforce the noncompete because the parent company lacked a legitimate economic interest in protecting subsidiaries unrelated to the employee's line of business, not because of the employee's capacity within his employer.[125] Here, all of the entities protected operate in the same business line, and the restrictions are limited to actual facilities, statewide protections grounded in Plaintiffs' business model, and expansion plans only insofar as Keel learned confidential information during his last six months of employment. The absence of a narrow "capacity" limitation does not diminish Plaintiffs' economic interest in their patient base, payor base, goodwill, and concrete and confidential expansion plans.

9. Keel also contends the definitions of "Business" and "Competitive Business" make the noncompete vague because they implicate unidentified entities

---

[124] 2026 WL 172862, at *8.

[125] 2022 WL 5240507, at *11 ("The RCA's noncompetition and nonsolicitation covenants are unreasonable in their geographic scope and scope of restricted activities because they are broader than necessary to protect Kodiak's legitimate economic interests."); *id*. at *12 ("Kodiak's legitimate economic interest that can support restraining Adams's employment is only in the goodwill and competitive space it purchased from Northwest in the market Northwest serves.").

beyond Bradford.[126]  But in *Payscale*, the Delaware Supreme Court found a similar but more expansive definition of "Competitive Business"[127] was appropriately tailored to protect a legitimate business interest given the defendant's involvement in company-wide initiatives and access to confidential information.[128]  The high court also found the inclusion of "unnamed subsidiaries" did not make the noncompetition restriction overly broad because there, like here, the subsidiaries operated in the same line of business.[129]

10.    Plaintiffs have also shown it is reasonably likely Keel breached the noncompete.  Plaintiffs presently operate facilities in Alabama, Florida, Indiana,[130] Mississippi, North Carolina, Tennessee, and Texas.[131]  They contend the future

---

[126] DAB at 35 (citing *Hub Group, Inc. v. Knoll*, 2024 WL 3453863, at *10 (Del. Ch. July 18, 2024), *appeal refused*, 346 A.3d 1127 (Del. 2024)).

[127] The *Payscale* Court grappled with the relationship between the defined terms "Competitive Activity" and "Competitive Business." 2026 WL 774876, at *4.  There, "Competitive Activity" was defined as "own, manage, operate, control, participate in, render services for, or in any other manner engage in, anywhere in the United States, any Competitive Business."  *Id.*  And "Competitive Business" was defined as "any business conducted by [Topco] or any of its Subsidiaries as of [Norman's] Separation Date or any business proposed to be conducted by [Topco] or any of its Subsidiaries as evidenced by a written business plan in effect prior to [Norman's] Separation Date."  *Id.*

[128] *Id.* at *6.

[129] *Id.*; A1917–18, Marsh 189–90; Marsh Supp. Aff. ¶¶ 2–4, Ex. A; *see supra* ¶ A.

[130] Ans. ¶ 14 (denying Plaintiffs operate a facility in Indiana); *but see* Marsh Aff. ¶ 4; A1909, Marsh Dep. 157 (testifying Bradford acquired a facility in Indiana).

[131] Ans. ¶ 14 (admitting Plaintiffs operate facilities in Alabama, Florida, Mississippi, North Caroline, Tennessee, and Texas); Marsh Aff. ¶¶ 4–5.

operations clause captures Arkansas, Virginia, and Ohio.[132]  Keel admits he has

"been employed" or "engaged by" Alsos, RCA, and Advita since resigning from

Bradford.[133]  They operate in Arkansas, Colorado, Indiana, Kentucky, Ohio

Delaware, Florida, Illinois, Indiana, Maryland, Massachusetts, New Jersey,

Pennsylvania, North Carolina, and South Carolina.[134]

11.    Keel argues his engagements with Alsos, RCA, and Advita do not

violate the noncompete because those firms are not Competitive Businesses.[135]  But

Plaintiffs have shown it is reasonably likely that they are.  Bradford offers inpatient

and outpatient addiction treatment for a patient population across the entire payor

mix.[136]  Advaita, RCA, and Alsos each operate addiction treatment facilities and

---

[132] Marsh Aff. ¶¶ 4–5.  Plaintiffs do not seek to enjoin Keel from working in Arkansas.

[133] A1125–26 (identifying Alsos, RCA, Advita as entities Keel has been "employed by, engaged by, provided services to since July 11, 2025."); A0741–43.

[134] A2132, A2141, Pucket Dep. 17, 50; *see* RCA Locations, https://recoverycentersofamerica.com/locations/ (last visited June 9, 2026); Addiction Treatment Programs, https://recoverycentersofamerica.com/treatment (last visited June 9, 2026); A2014, Boyle Dep. 29 (explaining Alsos "operate[s] activites facilities in Ohio, Indiana, Kentucky, Arkansas, and Colorado."); *see* Location, https://alsosbehavioralhealth.com/locations/ (last visited June 9, 2026); A1591, Johnson Dep. 18–19 (stating Advaita's locations as in the "Triangle Area" of North Carolina); *see* Our Ventures, https://advaita.health/ (last visited June 9, 2026).

[135] A0743; A1127–28; DAB at 46–52.

[136] Marsh. Aff. ¶¶ 4–6, 11; A1905–06, Marsh Dep. 141–42 (explaining approximately 35% of Bradford's patients at its Knoxville facility are insured through Medicaid); A1417, Keel Dep. 62 (explaining "Bradford accepts commercially insured individuals," individuals covered by Medicaid, and certain out-of-network individuals); *see* A1700, Masterson Dep. 34 (explaining approximately 30% of patients at Bradford's Red Oak facility are unhoused); *see also* Ans. ¶¶ 11–14.

provide a similar continuum of care.[137] Indeed, when Keel was Bradford's CMO, he identified RCA, Advaita, and Alsos as competitors.[138] Keel also argues the noncompete cannot bar his employment in Indiana or Virginia because Plaintiffs did not operate in those states when Keel resigned.[139] Keel's contention the noncompete cannot reach expansion opportunities ignores the role of Confidential Information in defining the scope of the noncompete, and is refuted by the record. Keel learned Confidential Information of Plaintiffs' expansion efforts in Indiana and Virgina during his last six months of employment.[140] Likewise, Keel's claim Ohio falls

---

[137] A1591, Johnson Dep. 19 (explaining Advaita provides "outpatient behavioral help including psychiatry, therapy, partial hospitalization, and intensive outpatient programming, as well as transcranial magnetic stimulation and ambulatory detoxification."); A2013–14, Boyle Dep. 25– 26 (explaining Alsos provides "medically-managed detoxification," "clinically managed residential treatment," and "intensive outpatient treatment"); A2132, Puckett Dep. 17 (explaining RCA provides "detox, residential, and outpatient [treatment] services."); *see also* RCA Locations, https://recoverycentersofamerica.com/locations/ (last visited June 9, 2026); Addiction Treatment Programs, https://recoverycentersofamerica.com/treatment (last visited June 9, 2026); Location, https://alsosbehavioralhealth.com/locations/ (last visited June 9, 2026); About Us, (https://alsosbehavioralhealth.com/about/ (last visited June 9, 2026); Our Ventures, https://advaita.health/ (last visited June 9, 2026).

[138] A2528–31 (identifying RCA and Avaita); A2456 (identifying Alsos); A2501–02 (identifying RCA); A2523 (identifying RCA); A2463 (identifying RCA and Alsos).

[139] DAB at 9–10.

[140] *E.g.*, A0401; A0404–86 (receiving materials evaluating expansion to Indiana on January 21, 2025); A0514–89 (sharing feasibility study for a facility in Virginia on May 2, 2025); *see* A1873, Marsh Dep 11–12 ("Mr. Keel had knowledge of Bradford's 3 plans to expand into Indiana, including plans for an IOP office in Indianapolis. . . . [I]t would be impossible for him to be able to provide information to [Alsos] about Indianapolis or Indiana without having the knowledge and being able to utilize the knowledge that he obtained from Bradford Health Services.").

outside the "Applicable Area" fails.[141] Keel received Confidential Information regarding Ohio expansion plans within his last six months with Bradford.[142]

12. Plaintiffs have also shown it is reasonably likely Keel breached the confidentiality covenant by sharing Bradford's feasibility study with Alsos, and by sharing Bradford's CEO scorecard and manuals with Advaita.[143]

13. Keel asserts he did not breach the confidentiality covenant because the information in the materials he disclosed is not "Confidential Information" as it was derived from publicly available sources.[144] But aggregated public information can constitute confidential information where the information provides economic value or synergic benefit.[145] The LPA bars the disclosure of information "not generally"

---

[141] Keel Aff. ¶ 40; A1426, Keel Dep. 100–01.

[142] *See* A2254–59 (corporate development presentation describing Plaintiffs' M&A strategy and noting Plaintiffs are evaluating Ohio); A1909, Marsh Dep. 154–55; A0404–46 (showing Keel received a confidential informational memorandum regarding an Ohio facility on January 21, 2025); A0447–83 (noting the "completed feasibility analysis" represents a "nearly complete review" of the Evoke Wellness facility in Hilliard, Ohio); A0579–89 (feasibility study of Evoke Wellness located in Hilliard, Ohio); A1120–21 (showing Keel participated as Aslos's "Chief Revenue Officer" during RCA's evaluation of certain Alsos-owned facilities in Ohio); *see* A2254–55 (including Ohio in Bradford's expansion plans); A1909, Marsh Dep. 155 (explaining Plaintiffs are still considering expanding to Ohio); *see also* A0252–310 (Medicaid expansion presentation prepared by Keel in 2023 addressing expansion efforts in states including Ohio).

[143] A0685–93 (Keel transmitting the Evansville feasibility study to Alsos in September 2025); A1176–273 (Keel transmitting Bradford's CEO scorecard and manuals to Advaita); A1419–20, Keel Dep. 73–74 (admitting to sharing the CEO Scorecard with Advaita and acknowledging he created the CEO for Bradford while employed by Bradford).

[144] *E.g.*, PAB at 42.

[145] *See, e.g.*, *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *21 (Del. Ch. Jan. 29, 2010) (compiled list of public data "would have taken

28

known by the public.[146]  The feasibility study, CEO Scorecard, and manuals represented Bradford's proprietary analysis of information; that the information informing that analysis was publicly available does not dilute the confidentiality of Bradford's analysis.[147]  Indeed, when Keel prepared the Evansville feasibility study in January 2025, he was cognizant of the confidential nature of the information and took steps to protect it by stamping each page of the study with a "CONFIDENTIAL" watermark.[148]

14.    As for the information Keel shared with Advaita, he argues that disclosure does not constitute a breach because it was unintentional.[149]  In Section 13.1, Keel agreed "not to disclose to any third party or use" any Confidential Information, full stop: his promise is not confined to intentional disclosure.[150]  And

significant effort and expense to create … [and] derived independent economic value from its nonpublic and confidential nature…"); *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 594 (Del. Ch. 2010) ("competitor could not have generated a similar system without expending a comparable amount of time and money").

[146] A0049–50 (§ 13.1).

[147] *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 96 (4th Cir. 2018) (company whose employee "spent months compiling" publicly available data "in particular groupings and . . . in a useful format" could claim trade secret protection over the compilation because of that employee's "painstaking" effort); *Arxada Holdings NA Inc. v. Harvey*, 351 A.3d 519, 553 (Del. Ch. 2026) ("[V]aluable information can be a 'combination of steps into a process . . ., even if all the component steps are known, so long as it is a unique process which is not known in the industry.'" (quoting *Elenza, Inc. v. Alcon Lab'ys Hldg. Corp.*, 183 A.3d 717, 721 (Del. 2018))).

[148] A0911–35; A0685–93.

[149] PAB at 25–26.

[150] A0049–50.

it seems Keel knew he was disclosing confidential information: when he disclosed Bradford's CEO Scorecard to Advaita, he noted the information was "shared for your eyes only[.]"[151]  It seems reasonably likely Keel breached Section 13.1.[152]

**Imminent Irreparable Harm**

15.  "Irreparable injury is an indispensable and essential factor in determining whether to grant injunctive relief,"[153] and an injunction "should not be issued in the absence of a clear showing of imminent irreparable harm to the plaintiff."[154]  "A 'threat of irreparable injury' typically will exist when a valid restrictive covenant is breached."[155]  The task of measuring the effects of such breaches "involves a costly process of educated guesswork with no real pretense of accuracy."[156]

---

[151] A1176.

[152] A0049–50.

[153] *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2367669, at *4 (Del. Ch. June 7, 2010) (citing *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989)).

[154] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 513 (Del. Ch. 2010) (citing *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.,* 1999 WL 160148, at *4 (Del.Ch. Mar. 11, 1999)).

[155] *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019) (quoting *Concord Steel. v. Wilm. Steel Processing*, 2008 WL 902406, at *10 (Del. Ch. Apr. 3, 2008)).

[156] *Alliant*, 2019 WL 2536104, at *20 (quoting *Hough*, 2007 WL 148751, at *18).

16.     Injunctive relief is "the principal tool of enforcing covenants not to compete" because breach of enforceable covenants threatens competitive harm.[157] Keel stipulated as much, although that is not the end of the analysis.[158] Here, RCA, Advaita, and Alsos operate in Plaintiffs' same industry. Keel was pivotal to Bradford's expansion into new markets and he emphasized that past success in seeking opportunities with RCA, Advaita, and Alsos.[159] Keel's improper use of Plaintiffs' Confidential Information, whether by sharing Bradford's materials or utilizing knowledge obtained while leading Plaintiffs' expansion efforts, would cause irreparable harm.

17.     As for Keel specifically, his willingness to ignore his promises to Plaintiffs predicts irreparable harm from future breaches unless he is enjoined. Keel has disregarded his restrictive covenants since Bradford paid him more money to

---

[157] *Concord Steel*, 2008 WL 902406, at *10 (quoting *Hough*, 2007 WL 148751, at *18).

[158] A0051–52; *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2015 WL 9487922, at *3 (Del. Ch. Dec. 29, 2015) (noting a stipulation to irreparable harm cannot operate to "impair the Court's exercise of its well-established discretionary role in the context of assessing the reasonableness of interim injunctive relief"); *see also Kodiak*, 2022 WL 5240507, at *6 ("This Court does not skip over applying a common law test simply because one party stipulates the test is not necessary.").

[159] *E.g.*, A0881–83; A1895, Marsh Dep. 98 ("Chandler is a master of data, and data analysis. And so some of the systems that he put in place that help us understand the flow of referrals, effectiveness of business development efforts, they still remain in place today. We still utilize the CMO workbook that he developed and provided to leadership. We still count some of the metrics that he established as being important. We still count those as important. Twenty-five 24 face-to-face meetings a week is something he established and that is something that we still hold as a standard for the business development team.").

stay and comply with them, starting with the Alsos consulting contract he signed in June 2025.[160] On June 27, while still employed by Bradford, Keel shared Bradford's site visit report with Alsos, using an Alsos email handle.[161] In August, Keel entered into a Services Agreement with Advaita and then shared Bradford's CEO Scorecard and business manual with Advaita.[162] The next month Keel sent Alsos a feasibility study on Evansville, Indiana, which he created while at Bradford.[163] By December, Keel was executing contracts on Advaita's behalf as its Chief Growth Officer.[164] On January 1, 2026, while this action was pending, Keel and other Advaita executives reviewed draft amendments to Advaita's operating agreement that contemplated Keel receiving a 2.5% stake in the entity.[165] Keel and Advaita discussed the announcement of his role as CGO, but Keel asked Advaita to "hold" the announcement after a call scheduled with his counsel.[166] In March, Keel agreed to

---

[160] A0613; A0647–60; A0618.

[161] A0661–65; A1600–01, Johnson Dep. 57–61 (Advaita's CEO testifying the material regarding a provider's "policies and procedures" is considered confidential in the industry); So far, Keel's work for RCA was limited to a one-time project. A0900–10 (contracting to provide RCA a five-state feasibility study); A0740–41.

[162] A0721–31; A1176–1273.

[163] A0685–92. The Evansville feasibility study was produced by Alsos, not Keel. *Id*.; *see* A0693 (providing Keel deleted the transmission of this email from his records).

[164] A0746–52.

[165] A0781–879.

[166] A2210; A1613, Johnson Dep. 106 ("Q: Was there ever a time where you and Mr. Keel discussed announcing his role with Advaita internally? A: Yes. I believe there was an email or Teams. This sticks out to me.").

an extension of his Consulting Services Agreement with Alsos.[167] Injunctive relief appears necessary to prevent Keel from irreparably harming Plaintiffs.

## Balance of the Equities

18.     Balancing the equities requires considering whether "specific enforcement of a validly formed contract would cause even greater harm than it would prevent."[168] Where the failure to grant an injunction will cause a plaintiff greater harm than granting the injunction would cause a defendant, the balance of equities favors the movant.[169] The balance of the equities generally weighs against the breaching party, especially where an injunction only mandates compliance with its existing contractual obligations.[170]

19.     The equities favor Plaintiffs. The preliminary injunction grants the relief Plaintiffs already bargained for under the ISA, Joinder Agreement, and LPA. Keel remains free to work for entities not implicated by the noncompete, including Raleigh House, where Keel has provided services since resigning.[171]

---

[167] A0666–79.

[168] *Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *8 (Del. Ch. Nov. 14, 2022) (quoting *Walton v. Beale*, 2006 WL 265489, at *7 (Del. Ch. Jan. 30, 2006)).

[169] *Cantor Fitzgerald*, 724 A.2d at 587.

[170] *See Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *30 (Del. Ch. Mar. 1, 2022) ("[A]s CorePower breached the APA . . . the balance of equities decidedly favors Level 4."); *Hastings*, 2022 WL 16921785, at *8 ("I find that the equities tip in HFH's favor since it has not breached the Agreement . . . .").

[171] A2230–36; A1127 (identifying The Raleigh House as an entity Keel served since July 11, 2025).

## Bond

20.     Court of Chancery Rule 65(c) requires an applicant for a preliminary injunction to post a bond in an amount to represent the damages the defendant would suffer if the injunction were improvidently granted.[172] "The amount of an injunction bond must be tied to the losses that can be proximately caused by a wrongful injunction."[173] "But, damages are not fully ascertainable until the court vacates the injunction . . . and because a wrongfully enjoined party has no recourse other than the security, the court should 'err on the high side' in setting the bond."[174]

21.     Plaintiffs shall post a bond in the amount of $400,000.00 within ten days of this order.[175] Keel's salary at Bradford was most recently $300,000, coupled with the ability to earn a performance bonus and to receive additional equity.[176] If Keel is wrongly enjoined, Plaintiffs' proposed bond provides adequate protection.[177]

---

[172] Ct. Ch. Rule 65(c) ("The Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

[173] *Buckeye Partners, L.P. v. GT USA Wilmington, LLC*, 2020 WL 2551916, at *11 (Del. Ch. May 20, 2020).

[174] *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 470 (Del. 2010).

[175] D.I. 78 at Proposed Order ¶ 3.

[176] Marsh Aff. ¶ 12.

[177] Keel's briefing failed to address bond. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

22. Upon entry of Plaintiffs' bond and until further order of the Court, Keel is hereby preliminary enjoined from, and may not:

a. directly or indirectly, in any manner, (whether on his own account, or as an employee, director, consultant, contractor, agent, partner, manager, joint venturer, owner, operator or officer of any other Person, or in any other capacity) engage in owning and operating residential and outpatient substance use disorder facilities and associated services, engage in owning of real estate used in the operation of substance use disorder treatment facilities, or own any interest in, manage, control, provide financing to, participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), or be employed by, consult with or provide services to: Alsos Behavioral Health, Recovery Centers of America, or Advaita Health Ventures LLC, including any affiliates thereof. For the avoidance of doubt, this restriction includes both formal and informal services and advice;

b. directly or indirectly, in any manner, (whether on his own account, or as an employee, director, consultant, contractor, agent, partner, manager, joint venturer, owner, operator or officer of any other Person, or in any other capacity) engage in owning and operating residential

and outpatient substance use disorder facilities and associated services, engage in owning of real estate used in the operation of substance use disorder treatment facilities, or own any interest in, manage, control, provide financing to, participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), or be employed by, consult with or provide services to any other entity that operates a behavioral health or substance use disorder facility in Florida, Texas, North Carolina, Alabama, Tennessee, Virginia, Indiana, Ohio, and Mississippi. For the avoidance of doubt, this restriction includes both formal and informal services and advice; and

c.     use or disclose any Confidential Information, as defined in the Amended and Restated Agreement of Limited Partnership of BHP Partners Co., LP (as amended) (the "LPA"), in violation of Section 13.1 of the LPA. For the avoidance of doubt, Confidential Information includes, but is not limited to, CEO Scorecards, Feasibility Analyses, Professional Development Plans, Site Visit Reports, Business Development Manuals, Admissions Manuals, or any other document containing Confidential Information. For the further avoidance of

36

doubt, use and disclosure includes, but is not limited to, utilizing documents containing Confidential Information as templates.

*/s/ Morgan T. Zurn*
Vice Chancellor Morgan T. Zurn
